REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 533

September Term, 2016

_____

ABDULLAH MALIK JOPPY
A/K/A RICHARD JOPPY

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.
Reed,
Moylan, Charles E., Jr.,
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: April 27, 2017

There is in this case a yawning disconnect between the suppression issue argued before Judge Nelson W. Rupp, Jr., in the Circuit Court for Montgomery County on December 10, 2015 and the more academically nuanced contention now being presented on appellate review. We do not mean to be critical of the more nuanced argument. It may well be a stronger argument than that actually made at the suppression hearing. It has been thoroughly researched. It has been articulately delivered, both in appellate brief and in oral argument before this Court on March 9, 2017. None of that, however, matters. The argument's fatal flaw is that it is not the one that was made at the suppression hearing. Our jurisdictional authority is limited to reviewing the suppression hearing that was and not the law school hypothetical that might have been.

It would be tempting to dismiss the entire suppression issue, which is the heart of the present appeal, on the ground that what was argued at the suppression hearing is not the subject of an appellate contention and, conversely, that what is now contended on appeal was never raised at the suppression hearing. That, however, might be too glib, so we will at least give the appellant the benefit of several "<u>arguendo</u>" considerations in the course of announcing several alternative holdings.

### The Case Before Us

The appellant, Abdullah Malik Joppy, a/k/a Richard Joppy, was convicted in a jury trial, presided over by Judge Marielsa Bernard, of 1) possession with intent to distribute a controlled dangerous substance ("CDS") and 2) of conspiring to do so. On appeal, he raises two contentions, the first one of which is in three parts.

I. Judge Rupp erroneously failed to suppress the physical evidence seized in a warranted search of the apartment of Victoria Gaines at 3320 Teagarden Circle,

  A. because the evidence was not legally sufficient to establish a nexus between the criminal activity of the appellant and 3320 Teagarden Circle;

  B. because any evidence tending to establish such a nexus was stale; and

  C. because, refuting in advance an anticipated arguendo argument by the State, the Good Faith Exception to the Exclusionary Rule is not available when the judicial error is one involving the nexus between the crime and the place to be searched.

II. Judge Bernard erroneously failed to grant in part a Motion for Acquittal because the State's evidence was not legally sufficient to support the conviction for possession of CDS.

## The Bigger Picture

Beginning in mid-2014, the Federal Bureau of Investigation ("FBI") and the Montgomery County Police Department began a joint investigation into illegal drug dealing in crack cocaine and heroin in the area surrounding the Bel Pre Square apartments in Montgomery County. The investigation involved the extensive use of surveillance, wiretapping, pen registers, and controlled drug buys by undercover agents. The investigation was conducted by over fifty local officers and federal agents in a year-long effort. The primary target of the investigation was George Gee, the kingpin of the illicit drug distribution network.

In early February 2015, the investigators obtained a warrant to conduct the electronic surveillance of telephones used by George Gee. When the initial authorization expired, the officers obtained renewed authorization through May 2, 2015. One of the key investigators was FBI Special Agent Charles Adams. It was Special Agent Adams who

2

applied for the search warrant that was issued, executed, and subsequently submitted to Judge Rupp for his review at the suppression hearing of December 10, 2015.

It was in the course of this larger investigation that the appellant was discovered to be one of the operatives of the drug distribution network run by George Gee.

## The Search of 3320 Teagarden Circle

The broad search warrant for which Special Agent Adams applied was aimed at three separate residences: 1) 51 Baileys Court in Silver Spring, which was described as the "primary residence" of drug kingpin George Gee, 2) 11 Farmcrest Court in Silver Spring, which was described as the "primary residence" of co-conspirator Andre Napper, and 3) 3320 Teagarden Circle, Apartment 104, which was described as the "primary residence" of the appellant. It is not without significance that not one of the "primary residences" was formally owned by or leased to George Gee, Andre Napper, or the appellant. Patterns do begin to emerge when looking at the totality that would completely escape us when looking only at an individual instance. We are less likely to believe that all three men were just casual "overnight guests." We must never ignore the totality.

The search warrant was issued by Chief Magistrate Judge William Connelly in the United States District Court on June 1, 2015. When it was executed at 3320 Teagarden Circle on the morning of June 8, 2015, both the appellant and his girlfriend, Victoria Gaines, were still asleep in the bedroom. In a closet in the bedroom, the investigators found, in a jacket pocket, a prescription pill bottle with two baggies of crack cocaine, weighing a total of five grams. In a suitcase in the same closet, the investigators found a digital scale.

## The Yawning Disconnect Between Suppression Hearing and Appeal

3

It is not we, of course, who are called upon to decide whether Special Agent Adams's application established probable cause to support a warrant to search the appellant's "primary residence" of 3320 Teagarden Circle. Chief Magistrate Judge Connelly decided that on June 1, 2015. In reviewing that decision on December 10, 2015, Judge Rupp decided that Magistrate Judge Connelly had had a substantial basis for issuing the search warrant.

Our limited role is to decide whether Judge Rupp was in error when he declined to grant the appellant's motion to suppress the physical evidence. The propriety of Judge Rupp's decision was based, of course, upon the evidence that was presented to him at the suppression hearing, to wit, the warrant application itself, and the arguments made by counsel. That hearing of December 10, 2015 produced a 13-page transcript. Eleven of the 13 pages reflect the argument of defense counsel. As he analyzed each intercepted phone call and each visual surveillance, the total thrust of the attack was that there was no probable cause to believe that the appellant was engaged in any criminal activity. Counsel announced his position as he began his argument, "It's our position that the application for the search warrant . . . does not show probable cause as it relates to [the appellant]." He went on more fully:

> There is nothing in here to indicate that Mr. Joppy was distributing anything or possessing with intent to distribute anything. There is no indication that the agent applying for the search warrant has observed any transaction between Mr. Joppy and any other individual.

(Emphasis supplied).

4

After a very brief and pro-forma response by the State, Judge Rupp ruled almost summarily that Magistrate Judge Connelly had had a substantial basis to issue the search warrant.

Of present pertinence is the fact that nothing at that suppression hearing made the remotest allusion to the issue of nexus. The word "nexus" was never used, nor even implied. No judicial opinion dealing with nexus was ever cited. The exclusive battle was over whether the appellant was in any way a criminal agent. The degree of attenuation between his behavior and 3320 Teagarden Circle was never raised. Judge Rupp was never called upon to make a ruling about nexus. There was no suggestion by anyone at the hearing that a potential sub-issue such as nexus even existed. The present contention, therefore, appears out of nowhere. It challenges nothing that was at issue at the suppression hearing of December 10, 2015. It raises a totally new issue for the first time on appeal. The very wording of the sub-contention leaves no doubt with respect to its exclusive argument:

> The Magistrate Did Not Have a Substantial Basis to Issue the Search Warrant Because <u>the State Did Not Establish a Nexus Between the Suspected Criminal Activity and the Residence</u> that Was Searched.

(Emphasis supplied). The very opening bar of the argument announced unequivocally its unmistakable leitmotif:

> The trial court erred in deciding not to suppress evidence found during the execution of the search warrant because <u>the warrant application did not establish the required nexus between suspected criminal conduct and the location to be searched.</u> In the absence of such a connection, there was no substantial basis for the magistrate to approve the warrant.

(Emphasis supplied). Indeed, at the very beginning of oral argument on March 9, 2017, this Court put what was, in effect, the following inquiry to counsel for the appellant:

5

In an effort to reduce the clutter, let us see if we can narrow the key issue before us. It seems clear from your brief that you are not contesting, as an issue on the subject of suppression, the criminality of the appellant himself but only the nexus between the observed criminal behavior of the appellant and 3320 Teagarden Circle as the place to be searched. Is that correct?

Counsel gave us express reassurance that our reading of the brief was correct and that the exclusion issue raised in the key sub-contention was the adequacy of the proof of nexus. That concession, however, was not critical, because a reading of the appellant's brief itself would permit no other conclusion. Our bottom line holding is that this entire line of argument, raised for the first time on appeal, was never mentioned at the suppression hearing ostensibly under review and has, therefore, not been preserved for appellate review.

### "Even If, <u>Arguendo</u>, . . ." No.1:
### Proof of the Nexus

Even if, purely <u>arguendo</u>, the appellant's challenge to the proof of the nexus had been preserved by having been raised and ruled upon at the suppression hearing, we would not hesitate to hold as an alternative resolution of this appeal that the evidence was sufficient to establish the necessary nexus. This three-month long investigation by over 50 agents, using telephone wiretaps, pen registers, and visual surveillance, was not aimed at low-level drug pushers making street sales. It was aimed at high-level operatives in the George Gee network, at the communication among these operatives, and at the subsequent movement of drug supplies in one direction and of cash in the other direction. Far more so than in the case of mere street dealers, the expert observation of Special Agent Adams in the application for the warrant, based upon his training and experience, places the issue of nexus at this level of a drug distributing network in necessary perspective.

[I]t is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, vehicles and/or businesses for ready access; that it is common for drug dealers to conceal proceeds from law enforcement authorities and rival narcotics traffickers; that drug dealers routinely use cellular telephones to facilitate their drug distribution operations; that drug dealing is an ongoing process that requires the development, use, and protection of a communications network to facilitate daily drug distribution; that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks; and that narcotics traffickers commonly use "coded" language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications.

(Emphasis supplied).

The appellant is being naïve when he focuses on the lack of evidence of low-level street sales at or near the residences of the three key operatives in this case. Such evidence is not to be expected. Once the criminal nature of the network itself is established, the nexus challenge is largely one of identifying the primary residences of the three key operatives (a particularly vexing problem when they do not assist the police by formally signing up for the ownership or rental of their primary residences). Significantly, at the suppression hearing when Special Agent Adams's warrant application was being reviewed, the appellant neither challenged the accuracy nor the pertinence of the agent's observation about the close connection between the high-level drug dealer and his residence.

Three of the intercepted telephone calls involving the appellant coupled with the visual surveillance conducted after each of those telephone intercepts tie down the nexus between the appellant's criminal activity and 3320 Teagarden Circle. On February 27, 2015 at 3:00 p.m., the investigators intercepted a call from the appellant to George Gee. The

7

warrant application described the substance of the call and of the surveillance that followed.

> Based on my training, experience, and knowledge of this investigation, your affiant believes that GEE and [the appellant] are arranging a drug transaction. During the conversation, <u>GEE directed [the appellant] to meet him "around Joe Thomas' joint," which your affiant believes to be the area of Bel Pre Drive</u>, also known as "Bel Pre Square." After intercepting this call, law enforcement officers conducted surveillance of Bel Pre Drive. At approximately 3:24 pm, <u>officers observed [the appellant] exiting Bel Pre Drive</u> driving a green Honda sedan, Maryland registration number 5BL6871. <u>Law enforcement officers</u> kept constant surveillance of [the appellant] and <u>observed him driving to and entering SUBJECT PREMISES</u> #1 at approximately 4:10 pm. Based on the above described call, <u>your affiant believes that, at the time he entered the SUBJECT PREMISES #1 [the appellant] was in possession of drugs.</u>

(Emphasis supplied).

The investigation on March 4, 2015 involved two intercepted calls from the appellant to George Gee and the intervening surveillance between the calls. The first call, from the appellant to George Gee, was at 4:59 p.m. Special Agent Adams described the call and the surveillance that followed.

> Based on my training, experience, and knowledge of this investigation, your affiant believes that [the appellant] and GEE were arranging a meeting to conduct a drug transaction. During the conversation, GEE asked [the appellant] what quantity of drugs he wanted ("what you trying to do"). [The appellant] replied that he wanted two ounces of drugs ("two"). GEE then directed [the appellant] to meet him at a specified location near Bel Pre Square ("oh yeah that's perfect, shit <u>meet me over there</u>, uh, <u>on the Good Hope [Road]</u> side man").
> 22. After intercepting this call, law enforcement officers conducted surveillance in the area of GEE's prior residence, 1367 Elm Grove Circle, Silver Spring, Maryland and in the area of SUBJECT PREMISE #1. At approximately 5:15 pm, officers observed [the appellant] enter SUBJECT PREMISE #1. <u>At approximately 5:45 pm, [the appellant] exited SUBJECT PREMISE #1, entered the green Honda sedan, and drove out of the neighborhood toward Good Hope Road.</u>

8

(Emphasis supplied).

At 5:43 p.m., the appellant placed a follow-up call to George Gee. Special Agent

Adams interpreted that call as one signaling a slight change in plans.

> Based on my training, experience, and knowledge of this investigation, your
> affiant believes that [the appellant] called GEE to let him know he is close to
> the agreed upon location for the drug transaction. GEE then informed [the
> appellant] that he was sending another person ("my son bout to come out
> there and see you") to conduct the drug transaction.
> 25. At approximately 5:49 pm, law enforcement officers intercepted an
> incoming call to GEE's CELLPHONE from a cellular telephone number
> utilized by Andre NAPPER.
> . . .
> Based on my training, experience, and knowledge of this investigation, your
> affiant believes that GEE wanted to meet with NAPPER to provide NAPPER
> with drugs to give to [the appellant]. Law enforcement officers subsequently
> observed NAPPER, driving a black Toyota Camry bearing Maryland tag
> number 2BL6017, pull into GEE's neighborhood and park in front of GEE's
> prior residence at 1367 Elm Grove Circle. A short time later, GEE was
> observed exiting his residence and meeting with NAPPER at NAPPER's
> Toyota Camry. After this meeting, GEE returned to his prior residence at
> 1367 Elm Grove Circle and NAPPER left the area. Officers continued to
> conduct surveillance on NAPPER, who drove to the area of Twig Road in
> Silver Spring, Maryland. A short time after NAPPER arrived on Twig Road,
> law enforcement officers observed [the appellant] leaving the area of Twig
> Road. Although officers did not observe NAPPER and [the appellant] meet,
> based on my training, experience, and knowledge of this investigation, your
> affiant believes that NAPPER served as a "middle man" and delivered the
> drugs from GEE to [the appellant] on Twig Road. Shortly after this
> transaction, officers observed NAPPER's Toyota Camry parked in front of
> SUBJECT PREMISE #2.

(Emphasis supplied).

A conclusory call from the appellant to George Gee assured Gee that everything had

gone according to plan.

> Based on my training, experience, and knowledge of this investigation, your
> affiant believes that [the appellant] called GEE to ensure GEE knew that [the

9

appellant] met with NAPPERS (referred to as "my son") and conducted the drug transaction ("I wasn't trying to look around. I was just, you know, making sure, you know"). GEE also confirmed that [the appellant] received two ounces of drugs ("that was two joints there").

At 9:42 a.m. on April 9, 2015, the agents intercepted a call from the appellant to George Gee. Special Agent Adams interpreted the call. His interpretation was that the appellant was at 3320 Teagarden Circle ("Subject Premise #1"), had cash with him at that location, and referred to that location as "the crib."

> Based on my training, experience, and knowledge of this investigation, your affiant believes that [the appellant] wanted an ounce of drugs from GEE ("[a]in't nothing, trying to grab one time"). GEE then directed [the appellant] to meet at a specific location, Good Hope Road, to conduct the transaction ("go around the Hope, young"). [The appellant] also indicated that he was at the SUBJECT PREMISE #1 3320 Teagarden Circle ("Alright, bout to leave the crib now") and presumably had drug proceeds with him at the SUBJECT PREMISE #1 to complete the transaction with GEE.

(Emphasis supplied).

Quite aside from the telephone intercepts and the visual surveillance, there was direct evidence establishing 3320 Teagarden Circle, Apartment 104, as the primary residence of the appellant. Such evidence makes counsel's reference to the appellant as "an overnight guest at the apartment where the warrant was executed" deliberately disingenuous. On April 2, 2015, the investigators interviewed the manager of the Knightsbridge Apartments, where 3320 Teagarden Circle is located, to inquire about the residential status of the appellant. The application for the search warrant recites:

> On April 2, 2015, law enforcement officers showed the manager of the "Knightsbridge Apartments" a photograph of JOPPY and the manager immediately recognized JOPPY as an individual that lives with GAINES in apartment #104, but is not on the lease. The manager stated that he has observed JOPPY at the apartment frequently and he believes JOPPY drives

10

a Honda. Additionally, while conducting physical surveillance, <u>law enforcement officers have observed JOPPY routinely entering and exiting SUBJECT PREMISE #1.</u>

(Emphasis supplied).

In support of this sub-contention, the appellant cites two opinions by the Court of Appeals: <u>Holmes v. State</u>, 368 Md. 506, 796 A.2d 90 (2002) and <u>Agurs v. State</u>, 415 Md. 62, 998 A.2d 868 (2010). The citation seems to be of dubious utility. In <u>Agurs</u>, the failure of the State to establish a nexus between observed criminal activity and one of the appellant's residences was not in dispute. It was a given. The legal question that was the subject of the opinion was whether the Good Faith Exception to the Exclusionary Rule should apply to the case. The overarching disutility of the citation, however, is that in <u>Agurs v. State</u> there was no authoritative opinion of the Court. Seven judges produced five opinions (one of which was a non-opinion). Judge Greene wrote a plurality opinion, joined by Chief Judge Bell and Judge Harrell. Judge Battaglia joined in the decision not to apply the Good Faith Exception, but she expressly declined to join in the opinion. Judge Barbera filed a dissenting opinion. Judge Adkins filed a dissenting opinion. Judge Murphy filed a concurring and dissenting opinion, expressly declining to join in the result. The appellant nonetheless quotes the plurality opinion as if it were the unblemished repository of authoritative law. It is not.

The authoritative Court of Appeals case on nexus is <u>Holmes v. State</u> (wherein seven judges produced a single opinion). <u>Holmes</u>, however, is not the best candidate for a "color patch" comparison with the case now before us, because it involved a direct police observation of Holmes engaging in a single street sale of drugs immediately after walking

11

out of his home, which was less than a block away. That's easy. <u>Holmes v. State</u> held, of course, that the nexus was solidly established. The appellant now uses <u>Holmes</u> to argue that the more circumstantial nexus here is not as indisputable as was the directly observed nexus there. To be sure! <u>Holmes v. State</u> is a good teaching example of how not to over-read an opinion. In reciting, quite properly, the unusually strong set of facts then before it, <u>Holmes</u> was not promulgating a <u>sine qua non</u> by which to disdain all less overwhelming proffers of nexus that might follow. The appellant, however, would seem to argue, in effect, that no baseball team could ever aspire to be a World Series champion unless it could compare favorably with the 1927 New York Yankees ("Who are these presumptuous upstarts from 2016 Chicago? They don't have a Babe Ruth or a Lou Gehrig in their lineup, let alone both."). The bar, fortunately, is not set that high.

Ironically, the very full and edifying analysis of the nexus issue in <u>Holmes</u> turns out to be extremely helpful to the State. <u>Holmes</u>, 368 Md. at 520, pointed to <u>Mills v. State</u>, 278 Md. 262, 363 A.2d 491 (1976) and <u>State v. Ward</u>, 350 Md. 372, 712 A.2d 534 (1998) as precedents for the permitted inference that perpetrators of crimes of violence will likely keep the weapons or other instrumentalities of crime in their homes. Mills had used a large hunting knife in the perpetration of a kidnapping, robbery, and rape. When arrested several days later, he was not in possession of the knife. In affirming the establishment of nexus in the <u>Mills</u> case, the <u>Holmes</u> opinion observed:

> Citing a number of Federal and State decisions, we concluded that <u>a reasonable inference could be drawn</u> from the facts that a specifically described weapon was used and that Mills was not in possession of it when captured the next day, <u>that it likely might be found in his house, and we therefore sustained the warrant.</u>

12

Holmes, 368 Md. at 520 (Emphasis supplied). Citing Jones v. United States, 362 U.S. 257,

270, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), Mills v. State itself, 278 Md. at 280, stated the

test:

> Although in a particular case it may not be easy to determine when an affidavit demonstrates . . . probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

In the Ward case, the murder weapon was a handgun. When arrested several days

later, Ward was unarmed. A warrant was issued to search both his home and his car for the

missing weapon. Holmes described, 368 Md. at 521, the successful establishment of the

nexus in State v. Ward.

> [W]e held that a neutral magistrate could reasonably conclude that Ward was a person likely to possess a handgun and would not likely dispose of it. From the further facts that Ward did not have such a weapon on him when he was first arrested within 48 hours after the murder and that one was not seen in his car, we held that a neutral magistrate could also reasonably infer that the weapon could be found either in his home or secreted in his car. Relying on Mills and a number of out-of-State cases, we determined that the case was one of those "doubtful or marginal cases" spoken of in Jones and United States v. Ventresca, 380 U.S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965), that "'should be largely determined by the preference to be accorded to warrants.'"

(Emphasis supplied). Judge Wilner's opinion for the Court of Appeals in Holmes, 368 Md.

at 521–22, went on to apply the lessons of Mills and Ward to cases involving drugs as well

as weapons.

> That same kind of deductive approach, based on reasonable factual assumptions, has been used by a number of courts in finding a nexus between observed or documented drug transactions and the likelihood that drugs or other evidence of drug law violations may be found in the defendant's car or home. The reasoning, supported by both experience and logic, is that, if a

13

person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that <u>those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant but not accessible to others, and that the defendant's home is such a place.</u>

(Emphasis supplied).

<u>Holmes</u> went on to cite cases from nine federal circuit courts of appeal using the same type of, what it called, "deductive approach." Once one gets beyond a cherry-picked sentence or two, the <u>Holmes</u> opinion, as a totality, is counter-productive to the appellant's case.

In <u>State v. Coley</u>, 145 Md. App. 502, 805 A.2d 1186 (2002), this Court followed <u>Holmes</u>'s lead on the nexus issue. In <u>Coley</u>, because the two controlled buys at issue had not occurred inside the suspect's home, the trial judge suppressed evidence later found in a warranted search of the home, finding that a sufficient nexus had not been established. The State appealed the ruling to this Court. We reversed the trial court and held that a sufficient nexus had been established. We first held that the suppression hearing judge had not been sufficiently deferential in reversing an earlier decision by another judge to issue the search warrant.

> A review of the motion court's quite thorough and detailed ruling . . . suggests that the motion court engaged in a <u>de novo</u> review of the existence of probable cause in the search warrant. The court's responsibility, however, was not to assess to its satisfaction the existence of probable cause, but, rather, to determine if the issuing magistrate's decision was supported by substantial evidence. In making that determination, the magistrate's decision is to be afforded great deference.

145 Md. App. at 521.

14

*Coley* pointed out, 145 Md. App. at 521, how the "substantial basis" standard, appropriate when a suppression hearing judge is reversing another judge's earlier decision to issue a warrant, is less demanding than would be required when making a *de novo* determination of probable cause *per se*.

> The substantial basis standard involves "something less than finding the existence of probable cause," [State v. Amerman], 84 Md. App. at 470–71, 581 A.2d 19 (citing Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085, 80 L. Ed. 2d 721 (1984)), and "is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial fact finding in a trial setting." Amerman, 84 Md. App. at 472, 581 A.2d 19.

> Thus, while the "clearly erroneous" test demands some legally sufficient evidence for each and every element to be proved—to wit, that a prima facie case be established—Illinois v. Gates rejected such a rigorous standard for establishing probable cause and opted instead for a "totality of circumstances" approach wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another. Illinois v. Gates, 462 U.S. at 235, 103 S. Ct. at 2330, expressly stated that a legally sufficient or prima facie showing [of probable cause] is not required[.] Amerman, 84 Md. App. at 473, 581 A.2d 19.

*Coley*, 145 Md. App. at 521, 805 A.2d 1186.

In holding that the nexus had been adequately established, *Coley* applied the *Holmes* analysis.

> In Holmes, the nexus test was satisfied with very little, if any, direct evidence. Instead, there was adequate circumstantial evidence that, when combined with reasonable inferences generated from that evidence, would support the finding of probable cause by the issuing magistrate. We can infer probable cause based on "the type of crime," i.e., possession and distribution of CDS; "the nature of the items sought," i.e., contraband and other drug trafficking materials (usually found in a drug dealer's home); "the opportunity for concealment," i.e., most likely in a residence considering the nature of the itemization and packaging of CDS and record-keeping

15

materials; "and reasonable inferences about where the defendant may hide the incriminating items[.]"

Id. at 530 (Emphasis supplied).

In State v. Faulkner, 190 Md. App. 37, 985 A.2d 627 (2010), the defendant was a drug dealer who maintained several different homes. With respect to the more far removed of those homes, the suppression hearing judge ruled that the search warrant did not establish an adequate nexus as to it. The State appealed to this Court. We reversed the suppression order. Judge Eyler's opinion began by reminding us of the appropriate standard of appellate review to be applied.

> When evidence has been recovered in a warrant-authorized search, it is not the task of a court ruling on a motion to suppress, or an appellate court reviewing the suppression decision on appeal, to conduct a de novo review of the issuing judge's probable cause decision. State v. Jenkins, 178 Md. App. 156, 163, 941 A.2d 517 (2008). Rather, those courts are to determine whether the issuing judge had a "substantial basis" for finding probable cause to conduct the search. Id. "The substantial basis standard involves something less than finding the existence of probable cause, and is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial fact finding in a trial setting."

190 Md. App. at 46–47 (Emphasis supplied).

The suppression hearing judge in Faulkner had made the mistake of deciding de novo the issue of probable cause as to nexus.

> The transcript of the suppression hearing in the case at bar reveals that the motion judge was making his own de novo decision as to whether there was probable cause to believe there would be evidence of drug dealing in the Plainfield Apartment. "The court's responsibility, however, was not to assess to its satisfaction the existence of probable cause, but, rather, to determine if the issuing magistrate's decision was supported by substantial evidence." Coley, 145 Md. App. at 521, 805 A.2d 1186. Thus, the motion court erred in deciding the issue of probable cause de novo.

16

Id. at 48 (Emphasis supplied).

After reviewing a number of federal circuit court decisions in detail, Faulkner held that nexus had been adequately established.

> Applying the same deductive reasoning the Court applied in Holmes, we answer that question affirmatively. The evidence showed that Faulkner actively was engaging in drug selling in Baltimore City, in bulk quantities, and that the nature of those crimes required him to have locations for processing narcotics for sale and for storing the narcotics, records of drug sales, and the profits from the drug sales.

Id. at 59 (Emphasis supplied).

Finally, Faulkner reminded us of the appropriate tie-breaker when making the close calls.

> Even if this case were a "close call" on probable cause, however, our task is not to decide probable cause but instead to decide whether there was a substantial basis for the issuing court's probable cause finding; and in doing so, we are to resolve a marginal case with preference to the warrant. We hold that the issuing judge had a substantial basis for finding probable cause to search the Plainfield Apartment.

Id. at 60 (Emphasis supplied).

Were this issue of nexus properly before us, we would not hesitate to hold that Magistrate Judge Connelly had a substantial basis for concluding that the warrant application adequately established a nexus between the criminal activities of the appellant and 3320 Teagarden Circle, Apartment 104 and that Judge Rupp did not err in so ruling.

### The Second Sub-Contention: Staleness of the Proof of Nexus

The appellant's second sub-contention is that even if the application for the search warrant had once shown a nexus between the appellant's criminal behavior and 3320

17

Teagarden Circle, that information had become fatally stale by the time Magistrate Judge Connelly issued the warrant on June 1, 2015. The thrust of the sub-contention was indisputably clear as the appellant's brief framed it in the following express terms:

> Even If the State Had Demonstrated a Nexus Between Victoria Gaines Apartment and George Gee's Suspected Drug Conspiracy, the Search Was Still Improper Because the Only Information Related to the Apartment Was More Than Three Months Old by the Time the Search Warrant Was Finally Executed.

(Emphasis supplied).

This particular argument covered three pages in the brief. The opening sentence well summarized the entire argument.

> Even if the surveillance on February 27 and March 4, 2015 created a nexus that could lead to a finding of probable cause, this information was stale by the time the search warrant was executed more than three months later on June 8, 2015.

(Emphasis supplied).

Just as in the case of appellant's first sub-contention, there is an unbridgeable gap between what is now being argued on appeal and what was decided at the suppression hearing before Judge Rupp. It is not for us to decide de novo whether the proof of nexus in the search warrant application was or was not stale. Our limited function is to decide whether Judge Rupp committed reversible error in ruling as he did. Our review, moreover, is confined to the four corners of the suppression hearing transcript. Whether Judge Rupp committed error depends upon his response to the evidence presented to him, to the arguments made by counsel before him, and to the precise issues he was called upon by the parties to resolve.

18

At the suppression hearing, the word "staleness" was never used and the very notion of the staleness of the proof of nexus never came up. It is a fascinating little enclave of Fourth Amendment law, but one that was never remotely raised at the suppression hearing. Our primary holding is that no issue with respect to the staleness of the proof of nexus has been preserved for appellate review.

### "Even If, <u>Arguendo</u>, . . ." No.2:
### The Evaporation Rate of Probable Cause

Even if, purely <u>arguendo</u>, an issue as to staleness of the proof of nexus were properly before us, the appellant would still not prevail on the merits. From our very beginning as an institution, this Court has been acutely alert to the issue of staleness. In <u>Clayton v. State</u>, 1 Md. App. 500, 503, 231 A.2d 717 (1967), we took up the issue as one of first impression.

> There is no statute in this State providing that the facts in the application, set forth to establish probable cause, must result from observations made within a designated time before the issuance of the warrant . . . .

We also found that there was no Maryland caselaw on the subject, as we went on to state "the remoteness of the facts observed from the date of issuance of the warrant is an element to be considered in each instance by the issuing authority in his determination . . . of whether it appears that there is probable cause. We do not feel compelled or persuaded to the contrary by the cases relied on by the appellant." <u>Id</u>. <u>See also</u> <u>Johnson v. State</u>, 14 Md. App. 721, 729–31, 288 A.2d 622, <u>cert. denied</u>, 266 Md. 738 (1972); <u>State v. Edwards</u>, 266 Md. 515, 521–24, 295 A.2d 465 (1972); <u>Washburn v. State</u>, 19 Md. App. 187, 195, 310 A.2d 176 (1973).

It was in <u>Andresen v. State</u>, 24 Md. App. 128, 172, 331 A.2d 78, <u>cert. denied</u>, 274 Md. 725 (1975), <u>and aff'd</u>, <u>Andresen v. Maryland</u>, 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976), that we set out definitely the controlling criteria:

> The ultimate criterion in determining the degree of evaporation of probable cause, however, is not caselaw but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

When <u>Andresen v. Maryland</u> went before the Supreme Court, Andresen "argued that there was a three-month delay between the completion of the transactions on which the warrants were based, and the ensuing searches, and that this time lapse precluded a determination that there was probable cause to believe that petitioner's offices contained evidence of the crime." 427 U.S. at 478–79, n. 9. The Supreme Court rejected Andresen's claim of staleness. In <u>Peterson v. State</u>, 281 Md. 309, 317, 379 A.2d 164 (1977), the Court of Appeals quoted in full and with approval this Court's statement of the controlling criteria. <u>See</u> <u>Patterson v. State</u>, 401 Md. 76, 93, 930 A.2d 348 (2007) ("The Court of Special Appeals explained the general rule of stale probable cause in <u>Andresen v. State</u> . . . , which we adopted in <u>Peterson</u>."). <u>See also</u> <u>Greenstreet v. State</u>, 392 Md. 652, 674, 898 A.2d 961 (2006); <u>West v. State</u>, 137 Md. App. 314, 347, 768 A.2d 150 (2001).

Whereas <u>Andresen v. State</u> spoke of an item of proof that might not be stale even after 30 years, <u>Behrel v. State</u>, 151 Md. App. 64, 823 A.2d 696 (2003) turned that sort of evidentiary endurance (16-18 years) into solid precedent. A teenaged sexual abuse victim had seen the priest/teacher sexual abuser place a pornographic video movie in a footlocker in his apartment at the St. James School near Hagerstown, Maryland on several occasions between 1983 and 1985. A later investigating officer testified that he had "learned through his training that sexual offenders tend to keep memories of prior acts along with pictures and videos." That observation by the teenager in the early 1980's led to the issuance of a warrant for the search of the footlocker in Grayslake, Illinois on February 2, 2001, 16 to 18 years later. The defense claimed that the probable cause was stale.

Applying the <u>Andresen</u> criteria, <u>Behrel v. State</u>, 151 Md. App. at 90–91, held that the proof of probable cause was not stale.

> [C]ontrary to appellant's suggestion, the mere passage of time and change of residence are not dispositive, because "[t]he likelihood that the evidence sought is still in place is a function not simply of watch and calendar . . . ." <u>Andresen</u>, 24 Md. App. at 172[.]

The <u>Behrel</u> opinion further explained:

> Instead, it was the nature of what was sought that was important here. According to the affidavit, both victims indicated that a footlocker in Behrel's campus apartment served as both a coffee table and a repository for sexual aids and pornographic materials. To the extent that <u>the footlocker</u> functioned as a piece of furniture and a repository for pornographic materials, it <u>never lost its utility. Nor was it perishable.</u> Furthermore, possession of the trunk was not incriminating in itself, so that it would not have been disposed of as contraband. And, the footlocker was readily transportable from one state to another. <u>See</u> <u>Andresen</u>, 24 Md. App. at 172[.]

21

151 Md. App. at 96 (emphasis supplied). See also West v. State, 137 Md. App. 314, 321, 768 A.2d 150 cert. denied, 364 Md. 536 (2001).

It is even so with respect to the observations about the primary residences of the three executives of the on-going drug distribution network in this case. Those observations did "not punch a clock." They ran from February through June of 2015. The "character of the crime" was that of "a regenerating conspiracy" and not "a chance encounter in the night." The conspiracy in this case had been fully operational for between three and four months. The appellant was "entrenched" and not "nomadic." He remained at 3320 Teagarden Circle throughout the life of the conspiracy. The "place to be searched" was a "secure operational base" and not a "mere criminal forum of convenience." This was no random street crime. Each of the three key conspirators operated from an unchanging primary residence.

Once a nexus between the appellant and 3320 Teagarden Circle is established, it is not only the visual surveillance of the residence itself that will serve to keep the probable cause fresh. The continuing criminal activity of the appellant himself will do so. Absent indications that the appellant has in the meantime moved away from his primary residence, his criminal activities in April and May served to keep alive the nexus that was established in February and March. The appellant frames much too narrow a focus. 3320 Teagarden Circle remained the appellant's primary residence and it was his ongoing criminal activity that kept the nexus fresh. See Connelly v. State, 322 Md. 719, 734. 589 A.2d 958 (1991) ("It is also possible to determine that the affiants, in preparing the affidavit, and relating their investigatory observations, were describing a continuing criminal enterprise, ongoing

22

at the time of their application, and thus the probable cause relied upon was not stale.") (emphasis supplied).

We do not, moreover, look at 3320 Teagarden Circle in a vacuum. There is at work an almost Newtonian law of motion: An object at rest will remain at rest unless acted upon by a force. The modality of keeping the evidence of nexus alive and fresh is a broad one. The observation, both by telephonic wiretap and by visual surveillance, of both George Gee and Andre Napper revealed that the criminal network was still functioning and, absent any indication to the contrary, the permitted inference is that the appellant remained an active member of that network and that his primary residence had not moved. What the appellant conveniently forgets is that once the appellant's participation in the George Gee conspiracy was established (as it most assuredly was), he and his primary residence were implicated by the criminal behavior of his co-conspirators as well as by his own. That larger complicity applies, moreover, not simply when proving guilt at trial but also when proving both probable cause and nexus in a warrant application. The appellant and his primary residence will be viewed in their fuller context and not in a vacuum. Had this sub-contention of staleness been properly preserved for appellate review, we would not hesitate to decide, as an alternative holding, that the proof of the nexus was not stale.

### "Even If, Arguendo, . . ." No.3:
### The Good Faith Exception

The possible applicability of the Good Faith Exception to the Exclusionary Rule is always available as an alternative holding to a ruling on a Fourth Amendment warrant. In her next to last sentence of argument at the suppression hearing, the Assistant State's

Attorney pointed out that "the officer relied on the warrant in good faith." The reference, of course, is to the landmark 1984 Supreme Court Case of <u>United States v. Leon</u>, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 and its companion case of <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 104 S. Ct. 3424, 82 L. Ed. 2d 737.

In <u>State v. Jenkins,</u> 178 Md. App. 156, 194–95, 941 A.2d 517 (2008), this Court reduced the purpose of the Good Faith Exception to a nutshell:

> The basic rationale of <u>Sheppard</u> and <u>Leon</u> is easy. <u>The Exclusionary Rule is intended to deter unreasonable police behavior, not judicial error. The judge may have made a mistake in issuing the warrant, but the officer is not unreasonable in relying on the judge's legal judgment.</u> Accordingly, the officer is not unreasonable in executing a judicially issued warrant and thus <u>exclusion is not called for even if the warrant is bad.</u>
>
> The launching pad for all further analysis is the recognition by <u>Sheppard</u> and <u>Leon</u> that <u>the police officer is not a lawyer and that the reasonableness of his investigative behavior,</u> therefore, <u>is not to be assessed as if he were.</u> After reaffirming that the only purpose of the Exclusionary Rule of Evidence is to deter unreasonable police behavior in the course of searching or seizing, <u>Massachusetts v. Sheppard</u>, 468 U.S. at 989–90, 104 S. Ct. 3424, stated emphatically that <u>it is not unreasonable for an officer to rely upon a warrant issued by a neutral and detached judge.</u>

(Emphasis supplied).

<u>Massachusetts v. Sheppard</u> pointed out that the only purpose of the Exclusionary Rule is to deter unreasonable police behavior and that the officer who relies upon the judge's decision is being quintessentially reasonable. The Supreme Court also made it pellucidly clear in <u>Sheppard </u>that the deterrent function of the Exclusionary Rule is aimed at the officer who conducts the search and not at the judge who issues the warrant.

> [W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested. In Massachusetts, as

in most jurisdictions, the determinations of a judge acting within his jurisdiction, even if erroneous, are valid and binding until they are set aside under some recognized procedure. If an officer is required to accept at face value the judge's conclusion that a warrant form is invalid, there is little reason why he should be expected to disregard assurances that everything is all right . . . .

. . . An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges."

Sheppard, 468 U.S. at 989–90 (Emphasis supplied).

The Leon opinion emphasized that the core protection provided by the Fourth Amendment is the warrant requirement. The Good Faith Exception's deference to the warrant is a way of encouraging resort by the police to that basic citizen protection from unreasonable searches and seizures.

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination.

Leon, 468 U.S. at 913–14 (Emphasis supplied).

The very core of the Good Faith concept is that it is reasonable for the police officer to defer to the warrant. In State v. Jenkins, 178 Md. App. at 196, we summed up that core purpose of the Good Faith Exception.

25

> When, therefore, the Leon thesis proceeds, the officer has abided by this core Fourth Amendment commandment to submit the decision to search and seize to a neutral and detached judicial figure, the officer has been eminently reasonable and should not suffer the exclusion of valuable evidence, because exclusion is only intended to be a sanction for unreasonable police conduct. It will be, therefore, only in rare and unusual cases that exclusion will still be appropriate in cases where the officer has obtained a judicially-issued search warrant.

(Emphasis supplied).

It follows from these fundamental precepts that even if, purely arguendo, the nexus issue had been preserved for appellate review, and even if, again arguendo, the evidence had been inadequate to support a finding of nexus, the officers still acted reasonably in relying upon Magistrate Judge Connelly's issuance of the warrant, and, pursuant to the Good Faith Exception, the Exclusionary Rule should not have been applied.

For all practical purposes, the Good Faith Exception was available to the State whenever the police obtained a search warrant. There was not much "wiggle room." In Herbert v. State, 136 Md. App. 458, 488, 766 A.2d 190 (2001), this Court described that all but absolute foreclosing effect.

> A second strong incentive for searching with warrants is the almost "fail-safe" security of being able to fall back on the "good faith" exception to the Exclusionary Rule. Even when the warrant is bad, the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches . . . . Under the Sheppard–Leon "good faith" exception to the Exclusionary Rule, it is hard for the State to lose a suppression hearing. It is equally hard to figure out why the State would not do everything in its power to exploit that overwhelming advantage whenever possible.

(Emphasis supplied).

26

*Leon* had been careful, however, to leave the door ever so slightly ajar. The opening, to be sure, was infinitesimally slight, prompting our observation in *State v. Jenkins*, 178 Md. App. at 194:

> *Leon*, to be sure, was careful "never to say never." There is, however, the almost Gilbert and Sullivan refrain of "Never? Well, hardly ever."

When a door is left ajar, there is an inevitable tendency, as the years go by, to push it, by small increments but unrelentingly, further open. In *State v. Jenkins*, 178 Md. App. at 199, we rued the tendency but accepted its inevitability.

> Everybody, in 1984 at least, appreciated how sweeping the good faith exception was and how truly rare the *Leon* exemptions from it would be. With the passage of a quarter of a century, however, sensitivity to the rarity of the exemptions seems to be sadly waning. The *Sheppard–Leon* doctrine took the issuance of bad warrants for granted but routinely applied the good faith exception. What we are now seeing, however, is an almost epidemic tendency to treat the mere issuance of a bad warrant as if it were what *Herbert v. State*, *id.*, characterized as "the rarest and most outrageous of warrants." The exemptions from the rule are threatening to swallow the rule, despite *Leon*'s assurance, 468 U.S. at 924, 104 S. Ct. 3405, that "[w]hen officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." It is that reassurance that is of late being seriously compromised.

(Emphasis supplied).

The appellant now joins in that crusade to eviscerate the Good Faith Exception. Instead of limiting the exemption from the Good Faith Exception to "the rarest and most outrageous warrants," he would extend it to any case where "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Such phrases and even whole sentences may be found in the multitudinous

27

caselaw, but such cherry-picking of tempting language does not represent <u>stare decisis</u>. An awareness of the bigger picture must predominate.

The Good Faith Exception was a watershed. Read in their totality, <u>Leon</u> and <u>Sheppard</u> explain that the Fourth Amendment's fundamental protection consists of taking the decision to search or to seize out of the hands of the officer, engaged in the often competitive enterprise of ferreting out crime, and entrusting it to the neutral and detached judicial figure. That location of the decision-making authority in the judge, whenever possible, is the very function and purpose of the Fourth Amendment's warrant clause.

The entire philosophy expounded by <u>Leon</u> and <u>Sheppard</u> is to encourage the transfer of decision-making authority to the neutral and detached magistrate. Everything in those two opinions sends the unmistakable message that the officer should defer to the judge, and for the officer to do so is <u>per se</u> reasonable. To tweak some random phraseology from the caselaw in order to suggest the absolute opposite—to wit, that "the well-trained officer who is presumed to know the law" should, in effect, second-guess the judge—would be a 180-degree repudiation of the fundamental message that <u>Leon</u> and <u>Sheppard</u> delivered. Obviously, they do not stand for that counter-proposition. <u>Leon</u> and <u>Sheppard</u>, moreover, have not been overruled. The appellant promiscuously over-reads what <u>Leon</u> actually said.

<u>Patterson v. State</u>, 401 Md. at 105, quotes with approval the decision of the Fourth Circuit Court of Appeals in <u>United States v. Bynum</u>, 293 F.3d 192, 195 (4th Cir. 2002), in which Judge Diana Motz explained that if the officer were required to follow his own view of the warrant's propriety rather than to defer to the judge's determination in that regard, it would eviscerate the entire purpose of the Good Faith Exception.

28

If a lack of a substantial basis also prevented application of the <u>Leon</u> objective good faith exception, the exception would be devoid of substance. In fact, <u>Leon</u> states that . . . a finding of objective good faith is [prevented] . . . when an officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely reasonable." <u>Leon</u>, 468 U.S. at 923, 104 S. Ct. 3405, 82 L.Ed.2d 677 (citations omitted). This is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.

As a guide for where to look for the legal precepts controlling the Good Faith Exception, a good starting point might be <u>State v. Jenkins</u>, 178 Md. App. at 200:

As the years since <u>Leon</u>'s promulgation have gone by, however, there has been <u>an insidious tendency not to go back to the primary source but to rely on secondary sources</u>, with their inevitable accretions of new language. For any serious student of history, it is an article of faith not to look to secondary sources if the primary source is available. Analysis is always treacherous when we take secondary and even tertiary sources as the starting point of that analysis. <u>Lawyers</u>, however, <u>are notoriously poor students of history. The nature of their profession inclines them to exploit its possibilities rather than to cherish its accuracy. If one looks at a gloss and then at a gloss upon a gloss, with each additional gloss adding new accretions of language, the original message can easily become lost. If one wants to know what Leon said, reread Leon.</u>

(Emphasis supplied).

As a limitation on the Good Faith Exception to the Exclusionary Rule, <u>Leon</u> points out, 468 U.S. at 922–923, that there might be "some circumstances" in which the officer would not be reasonable in believing that "the warrant was properly issued."

Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, . . . and it is clear that <u>in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.</u>

(Emphasis supplied).

29

Those circumstances, Leon made clear, would be rare and truly extreme. In a single paragraph, Leon listed four such sets of extreme circumstances. The first is the self-evidently unreasonable situation in which the officer himself has furnished the judge with false and perjurious information. It is an extreme circumstance that, since 1978, has been handled by the special procedure set forth by Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Franks v. Delaware[.]

Leon, 468 U.S. at 923. See also Patterson v. State, 401 Md. 76, 105–06, 930 A.2d 348 (2007). This exemption rarely poses a problem.

The second of the rare situations listed by Leon as an exemption from the Good Faith Exception is that in which the judge has totally abdicated his judicial role.

> The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo–Ji Sales, Inc. v. New York.

Id. The lone example given is Lo–Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979), a case in which the judge actually participated in the search for pornographic film after issuing an open-ended warrant and indicated that he would review various items for their obscenity after they had been seized. This is also an extremely rare exemption from the Good Faith Exception. See Patterson v. State, 401 Md. at 106.

30

It is at this point convenient to jump ahead and to look at <u>Leon</u>'s fourth and final listed exemption. It concerns the rare case in which the warrant is facially deficient in that it fails to specify the place to be searched or the thing to be seized.

> Finally, depending on the circumstances of the particular case, a warrant may be so <u>facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized</u>—that the executing officers cannot reasonably presume it to be valid.

<u>Leon</u>, 468 U.S. at 923. <u>Leon</u>'s companion case, <u>Massachusetts v. Sheppard</u>, is cited as the only example. In <u>Sheppard</u> there had been a woeful non-compliance with the particularity clause. <u>See</u> <u>Patterson v. State</u>, 401 Md. at 110. None of the three exemptions listed above typically poses any problem in applying the Good Faith Exception.

It is the third of <u>Leon</u>'s list of special circumstances that has tempted the defense bar to expand its contours beyond anything imagined by <u>Leon</u> itself and, indeed, to urge an interpretation incompatible with <u>Leon</u>'s core message.

> Nor would an officer manifest objective good faith in ruling on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

<u>Leon</u>, 468 U.S. at 923.

Citation is then made to the concurring opinion of Justice White in <u>Illinois v. Gates</u>, 462 U.S. 213, 264, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), in which he refers to situations in which "it is plainly evident that a magistrate or judge had no business issuing a warrant." The citations given by Justice White in his concurrence in <u>Gates</u> and by the <u>Leon</u> opinion itself serve to keep the exemption from the Good Faith Exception within bounds by illustrating the extreme circumstances with which it is intended to deal. This <u>Leon</u>

31

exemption was clearly intended to cope with a purely conclusory statement in a warrant application which lacks further supportive data. One example there given of a purely conclusory warrant application was Aguilar v. Texas, 378 U.S. 108, 109, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), where the application simply recited:

> "Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law."

(Emphasis supplied).

The second example cited was Nathanson v. United States, 290 U.S. 41, 44, 54 S. Ct. 11, 78 L. Ed. 159 (1933), in which the warrant application was even more nakedly conclusory.

> Francis B. Laughlin has stated under his oath that he has cause to suspect and does believe that certain merchandise [which is then described] is now deposited and contained within the premises of J.J. Nathanson [with the address then being given].

(Emphasis supplied).

The final example of such a "bare bones" or purely conclusory application was Giordenello v. United States, 357 U.S. 480, 481, 78 S. Ct. 1245, 2 L. Ed. 2d 1503 (1958), in which the self-evidently inadequate application recited simply:

> That on or about January 26, 1956, at Houston, Texas in the Southern District of Texas, Veto Giordenello did receive, conceal, etc., narcotic drugs, to-wit: heroin hydrochloride with knowledge of unlawful importation; in violation of Section 174, Title 21, United States Code.

These three examples tell us what Leon meant by "bare bones" or "conclusory" warrant application. The condemnation does not apply to every warrant application that is

inadequate, even if a well-trained police officer might be able to second-guess the judge in that regard. If we truly wish to know, therefore, what <u>Leon</u> meant by a "purely conclusory" or "bare bones" warrant applications, we must look to the three examples of such given in <u>Leon</u>. We must then measure the application now before us against the applications found to have been "purely conclusory" in the <u>Aguilar</u>, <u>Nathanson</u>, and <u>Giordenello</u> cases.

The application before us was made by Special Agent Charles Adams of the Federal Bureau of Investigation. It was a tightly packed 29-page affidavit, recounting in full detail a three-month investigation by over 50 local and federal agents. It included a controlled buy of narcotics by an undercover officer. It included the full report of and interpretation of 13 separate telephone intercepts. It included details of six separate automobile surveillances. This was the polar opposite of <u>Aguilar</u>'s "received reliable information from a credible person and do believe" or of <u>Nathanson</u>'s "has cause to suspect and does believe." <u>Giordenello</u> does not allege even that much. To characterize the fully fleshed out affidavit in this case as a "bare bones" application is to push the metaphor beyond its limit. There is no comparison. This warrant application was not "conclusory" or "bare bones."

This is the view of the Good Faith Exception that has been applied consistently by the Court of Appeals. <u>Connelly v. State</u>, 322 Md. 719, 725–35, 589 A.2d 958 (1991); <u>Minor v. State</u>, 334 Md. 707, 712–20, 641 A.2d 214 (1994) ("A test that looks to whether the police officer knew that the warrant issued by the judge should not have been issued would seem to place the police officer in the position of reviewing the decision made by the judge, but that is not what <u>Leon</u> requires."); <u>McDonald v. State</u>, 347 Md. 452, 467–73, 701 A.2d 675 (1997); <u>Patterson v. State</u>, <u>supra</u>, 401 Md. at 104–111 ("Officer Haak's affidavit was

33

not 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"); Marshall v. State, 415 Md. 399, 408–12, 2 A.3d 360 (2010) ("Cases in which courts have refused to apply the good faith exception demonstrate that the safe harbor of the exception is foreclosed only when there exists essentially no evidence to support a finding of probable cause."). This Court has also been consistently in line. West v. State, 137 Md. App. 314, 351–56, 768 A.2d 150 (2001) ("The points appellant raises regarding Leon are the very reasons for which we found that the warrant was based on insufficient probable cause. That is precisely why the Leon good-faith exception exists—it is applicable in cases like this where there is not quite enough probable cause to support the issuance of a warrant, but the warrant should nevertheless be upheld because the police officers relied upon it in good faith, pursuant to the standards articulated in Leon, supra. We point out to appellant that there would be no need for exceptions to laws if the standards are the same for both the law and its exception."); State v. Jenkins, supra.

Even if, arguendo, the warrant application in this case were held to be inadequate, the police would nonetheless have behaved reasonably in relying upon the judicially issued warrant and the Good Faith Exception to the Exclusionary Rule would dictate that Judge Rupp did not err in denying the appellant's motion to suppress the evidence.

### Legal Sufficiency of the Evidence

The appellant's second contention is that the evidence was not legally sufficient to support his conviction for the possession of cocaine. The State makes the threshold challenge that the appellant's Motion for Judgment of Acquittal was unilluminatingly generic and did not satisfy Rule 4–324(a)'s requirement that such a motion "state with

34

particularity all reasons why the motion should be granted." In this case, however, we believe that a holding of non-preservation would be a bit harsh. We would agree that an issue as subtle as nexus would not be preserved by a non-particularized motion for acquittal, nor would an issue as nuanced as staleness. On the other hand, even a non-particularized motion packs more preservative punch than does a non-motion. We will treat the motion as sufficient to challenge whether the State has met the single, linear, one-on-one requirement of offering some evidence of guilt of the core crime charged. We will permit a generic motion for acquittal to preserve for appellate review the question of generic legal sufficiency. We will not, however, indulge a generic motion more broadly than that.

We make another threshold observation. The appellant has not challenged the legal sufficiency of the evidence to support his conviction for conspiracy. He was convicted of conspiracy and received a concurrent sentence of 17 years for conspiracy. The appellant's contention makes its limited coverage expressly clear.

> THE TRIAL COURT ERRED IN DENYING THE MOTION FOR ACQUITTAL BECAUSE THE STATE PRESENTED INSUFFICIENT EVIDENCE AS A MATTER OF LAW TO CONVINCE A REASONABLE TRIER OF FACT THAT MR. JOPPY <u>POSSESSED THE CONTROLLED SUBSTANCE FOUND IN HIS GIRLFRIEND'S RUNNING JACKET</u>.

(Emphasis supplied).

In reading the contention carefully, we also note that it is confined to "the controlled substance found in his girlfriend's running jacket." The appellant thus does not challenge the finding of the scales found in the closet of what could inferentially be deemed to be his bedroom. Nor does the appellant challenge the possible inference that the appellant was in

35

constructive possession of other drugs during the course of the three-month old conspiracy. He was, after all, convicted of being actively engaged in a conspiracy to distribute something, and that something was not Girl Scout Cookies. The appellant, significantly, raises no challenge to such a permitted inference.

The appellant insists that he was nothing more than a casual overnight guest at the apartment of his girlfriend. That, of course, is a possibility. There is also another possibility, however, namely that, as the warrant application alleged, 3320 Teagarden Circle was his primary residence throughout the three-month life of the conspiracy. To help us resolve a choice such as this, we are enjoined, as a matter of law, to take that version of the evidence most favorable to the prevailing party, to wit, the State. We are dealing with the burden of production and not with the burden of persuasion. That version of the evidence most favorable to the State is that 3320 Teagarden Circle was the primary residence of the appellant throughout the life of the investigation. According to that version, the appellant was asleep in his own bedroom when the search party barged in. The closet that was searched belonged to that bedroom. The jacket in the pocket of which the pill bottle was found may have belonged either to the appellant or to his girlfriend. The State's best version of the evidence requires that we draw the former conclusion. The ownership of the jacket, however, was inconsequential. The body of evidence that permitted the jury to find that the appellant was a distributor, and not a mere possessor, of drugs was the entire four-month investigation and not the gender of the jacket containing a pill bottle.

When the police searched 3320 Teagarden Circle on the morning of June 8, 2015, they found the appellant asleep in his bedroom, along with his girlfriend. The closet

36

searched was the closet of that bedroom. The closet contained men's clothing and women's clothing. Assuming that the evidence could not connect both the appellant and Victoria Gaines to the drugs and that a choice had to be made between them, the more likely candidate would certainly be the one who had been, for three months, an active participant in a drug distribution network rather than Victoria Gaines, against whom no such involvement had been demonstrated.

Testifying as an expert on the drug trade, Sergeant Jason Cokinos stated that the quantity of drugs found in the bedroom closet on June 8 suggested drug distribution and not personal use. It was the appellant whom the evidence showed to be a drug distributor. During the search, a pill bottle was found in a jacket pocket. The pill bottle contained two baggies of what turned out to be cocaine. Each baggie contained approximately 3.5 grams of cocaine.

We hold that the evidence was legally sufficient to connect the appellant with the cocaine found in his bedroom closet on June 8, 2015. We further hold that the evidence was legally sufficient to support the conviction of the appellant for the possession of cocaine with the intent to distribute it.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**