*Kyle Thompson v. State*, No. 0198, September Term 2019.  Opinion by Wells, J.

**SEARCHES AND SEIZURES – WARRANTS – *FRANKS* HEARINGS**

Appellant, Kyle Thompson, challenged the validity of a search warrant obtained for his home claiming that an investigating officer misled the issuing judge in obtaining the warrant. Police requested the warrant based on information they received from a confidential source that Thompson recently abused one daughter and was likely to abuse her again within days.  After his arrest for child abuse and related charges, Thompson requested a *Franks* hearing to test the validity of the claims made by the investigating officer seeking the search warrant.

**SEARCHES AND SEIZURES – WARRANTS – *FRANKS* HEARINGS – MANDATORY MOTIONS -- WAIVER**

The Court of Special Appeals held that Thompson's request for a *Franks* hearing was not timely filed under Maryland Rule 4-252, it being a mandatory motion that must be filed "within 30 days of the entry of the appearance of a defendant's first attorney. The later appearance of other counsel does not revive the 30–day period in which to file such a motion." *Allen v. State*, 91 Md. App. 775, 780 (1992).  Here, where Thompson's first counsel did not request a *Franks* hearing within 30 days of the entry of appearance that delay acted as a waiver, even though subsequent counsel made a later request.

**SEARCHES AND SEIZURES – WARRANTS – *FRANKS* HEARINGS – MANDATORY MOTIONS -- WAIVER**

Subsequent counsel's request for a *Franks* hearing based on a claim that discovery revealed the need to challenge the search warrant was not timely as Maryland Rule 4-252(b) requires that in such cases the request must be made within five days of acquiring the information in discovery.  Here, the request for a *Franks* hearing was made almost a month after this deadline.

**SEARCHES AND SEIZURES – WARRANTS – *FRANKS* HEARINGS – DEFENDANT'S BURDEN**

Despite our conclusion that Thompson waived his right to a *Franks* hearing, because the issues he presents are significant, we consider the merits of Thompson's claims.  The burden on the defendant in requesting a *Franks* hearing is "a substantial preliminary showing," not a preponderance of evidence.  The latter is the burden to be applied *within* the *Franks* hearing itself, where a defendant is permitted to go beyond the four corners of the warrant and cross-examine the affiant to prove he or she made a materially misleading statement or omission.

**SEARCHES AND SEIZURES – WARRANTS – *FRANKS* HEARINGS – DEFENDANT'S BURDEN**

If considered, we conclude that Thompson did not meet his burden of preliminarily showing that the investigating officer misled the issuing judge by using intentional falsehoods or by statements that recklessly disregarded the truth. Further, we conclude that even if the challenged statements in the affidavit were excised, the court nonetheless had probable cause to issue the search warrant.

**SEARCHES AND SEIZURES – WARRANTS – PROBABLE CAUSE - SUFFICIENCY**

Our examination of the probable cause basis for the search warrant reveals that the information the confidential informant provided the police was reliable in that it could be corroborated by other competent evidence. Further, there was a sufficient nexus between the information obtained from the confidential informant and the house that was searched.

Circuit Court for Montgomery County
Case No. 131547(Criminal)

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0198

September Term, 2019

———————————————————

KYLE THOMPSON

v.

STATE OF MARYLAND

———————————————————

Leahy,
Wells,
Sharer, J. Frederick
   (Senior Judge, Specially Assigned)

JJ.

———————————————————

Opinion by Wells, J.

———————————————————

Filed: April 7, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant, Kyle Thompson, appeals from the Circuit Court for Montgomery County's denial of his motion for a *Franks* hearing and its denial of his challenge to the sufficiency of a search warrant. The court found Thompson had failed to make the required showing that the affiant-police officer made false statements that led a judge to find probable cause to issue a search warrant for Thompson's house. Thompson's appeal presents two questions for our review, which we reproduce verbatim:

1. Whether the court below erred when it denied Thompson's request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), regarding the veracity of the affiant's statements contained in the search warrant affidavit?

2. Whether the court below erred when it denied Thompson's challenge to the sufficiency of the March 17, 2017, search warrant for his residence?

For the reasons discuss below, we answer each question in the negative and affirm the judgment of the circuit court.

## BACKGROUND

### A. Police Receive Information from a Confidential Informant and Prepare a Search Warrant Affidavit

On the evening of March 16, 2017, the Special Victims Investigation Division of the Montgomery County Police, Maryland Police Department ("MCPD") received a case involving the alleged sexual assault of a minor. The FBI emailed Sergeant Monique Tompkins ("Sgt. Tompkins") details of a conversation that the FBI had with a confidential informant ("C.I.") on March 15.[1] Those details alleged, among other things, that a few

---

[1] The record indicates the C.I. was previously unknown to law enforcement. Although she asked that her name remain private, she provided police with her name,

days prior Thompson showed the C.I. videos of him sexually assaulting his four-year-old daughter ("Child 1")[2].

That evening, MCPD detectives made four phone calls to the C.I.: *First*, a thirty-two (32) minute, recorded phone call from the desk of Michelle Sears of Montgomery County Child Protection Services ("CPS") (located in the same building as MCPD) joined by Detective Avelar ("Det. Avelar") who is supervised by Sgt. Tompkins; *second*, a five-minute unrecorded call from Sears' desk to the C.I.; *third*, a seven-minute unrecorded phone call from the desk of Det. Avelar to the C.I.; and *finally*, another five-minute unrecorded phone call from Det. Avelar's desk to the C.I. In discovery, a prosecutor admitted to the defense that while Sgt. Tompkins was not present for the first and main interview, she was present for at least one of the shorter, unrecorded phone calls placed from Det. Avelar's desk. Between the second and third phone call, Sears printed a 2015 CPS report that appeared to detail sexual assault allegations by Victim A (Child 1's older half-sister) against Thompson.

---

address, phone number, and employer. Thus, she is more aptly described as a "confidential" rather than "anonymous" source.

[2] For clarity in reviewing this opinion alongside the record, we adopt the same pseudonyms used in the record: "Victim A" refers to the nine-year old daughter of Thompson's ex-girlfriend, whom the warrant affidavit alleged Thompson sexually assaulted years prior; "Child 1" refers to Thompson's four-year-old daughter, who is also the younger half-sister of Victim A.

Following these phone calls, Det. Avelar drafted an application for a search warrant and e-mailed it to Sgt. Tompkins at 1:40AM on March 17, 2017. Part of the investigation summary provided:

> On March 16, 2017, the writer interviewed the anonymous source.
>
> * * *
>
> The source further stated that Thompson had previously sexually abused [Child 1's] older sister [Victim A] a few years back; [Victim A] was approximately 9 years old when he sexually abused her. The writer conducted a check with Child Protective Services and other police agencies and was able to corroborate the information given by the source regarding [Victim A]. The writer found a sexual abuse report from Baltimore County Police from October 2015. The report stated [Victim A] was sexually abused by her mother's boyfriend "Kyle." [Victim A's] mother lied to the Police and Child Protective Services of not knowing his full name and where about (sic). [Victim A] disclosed the abuse happened when her and her mother went to "Kyle's house" located on Ballinger Terrace, Burtonsville, MD.
>
> Thompson stated the abuse[] happened in a wooded area near his [house] in Montgomery County, Maryland.

The next day, March 17, 2017, while Det. Avelar went to Baltimore County to review forensic interviews of Victim A's allegations, Sgt. Tompkins was in the MCPD office revising the search warrant affidavit. Later that day, Sgt. Tompkins appeared before Judge Ronald Rubin with the revised search warrant application, now containing her signature rather than Det. Avelar's. The quoted part of the investigative summary, with revisions emphasized, now read as follows:

> On March 16, 2017, the writer interviewed the anonymous source.

-3-

* * *

The source further stated that Thompson had previously sexually abused [Child 1's] older sister [Victim A] a few years prior. [Victim A] was approximately 9 years old when he sexually abused her. The writer conducted a check with Child Protective Services and other police agencies and could corroborate the information given by the source regarding [Victim A]. The writer found a sexual abuse report from Baltimore County Police from October 9, 2015. The report stated [Victim A] was sexually abused by her mother's boyfriend "Kyle." *Anonymous source related that* [Victim A's] mother lied to the Police and Child Protective Services, relating that she did not know the suspect's full name and whereabouts. *Anonymous source stated that* [Victim A] disclosed that the abuse happened when her and her mother went to "Kyle's house" located at 14215 Ballinger Terrace, Burtonsville, MD.

Thompson stated *to the anonymous source* the above abuse happened in a wooded area near his house in Montgomery County, Maryland.

(emphasis added). Notably, even this final affidavit signed by Sgt. Tompkins read under the "OATH" section, "Detective Melvin Avelar, personally appeared before me…" Judge Rubin signed the search warrant.

## B. MCPD Obtains a Search Warrant, Seizes Evidence, and the State Charges Thompson

With the search warrant in hand, the police searched Thompson's home. The police recovered videos of sexual assaults as described by the C.I. On April 13, 2017 a grand jury for the Circuit Court of Montgomery County returned an indictment charging Thompson with 78 counts of sexual abuse of a minor and related sex offenses based primarily on the videos obtained in the search of Thompson's home.

Thompson's first attorney entered his line of appearance on April 17, 2017. On June 30, 2017, counsel filed a Motion to Suppress Evidence and a Motion to Suppress a Custodial Statement. Thompson withdrew those motions without prejudice on January 11, 2018 and agreed with the State that unless the case was resolved via a plea agreement the State would consent to a hearing on those motions. On May 24, 2018, another attorney entered a line of appearance on behalf of Thompson, and on June 6, 2018 the court granted Thompson's motion to strike his first attorney's appearance.

During this time, a parallel federal case commenced in the United States District Court for the District of Maryland. Thompson was represented by the same attorneys.

### C. Thompson's Request for a *Franks* Hearing is Denied

On July 23, 2018, Thompson filed a request for a *Franks* hearing asserting that, based on information he had only recently learned in the federal case, Sgt. Tompkins intentionally misled the issuing judge in her affidavit. Thompson specifically grounded his claim on Sgt. Tompkins' sworn statement that "the writer interviewed" the C.I. But Sgt. Tompkins had not been present for the main phone interview Sears and Det. Avelar conducted with the C.I. The State filed its opposition on August 15, 2018. On September 24, 2018, the day before the circuit court held a hearing to consider the *Franks* motion, Thompson supplemented his reply brief with several draft affidavits from Det. Avelar and Sgt. Tompkins as further proof that Sgt. Tompkins intentionally misled Judge Rubin.

-5-

At the hearing, discussion between the court and counsel focused on Sgt. Tompkins' role in interviewing the C.I. and the accuracy of the phrasing "the writer interviewed," rather than the affidavit revisions. No witnesses were called.

The court's ruling was in two parts. First, the court ruled that Thompson's request for a *Franks* hearing was waived under Maryland Rule 4-252, which required filing of mandatory motions such as a *Franks* request, within thirty (30) days of April 17th, 2017, the date Thompson's first attorney appeared on Thompson's behalf. The court noted that because Thompson's first attorney timely filed motions to suppress evidence, including a custodial statement, and had authored an article on *Franks* hearings, his failure to request a *Franks* hearing could not have been an error.

Second, the court also ruled on the merits. It explained that based on its review of the evidence and case law, it found Thompson had not met his burden of showing that Sgt. Tompkins made false or reckless statements such that those statements established probable cause. The court addressed the heart of the argument in Thompson's motion, saying, **"**I don't think it's improper or misleading or reckless to tell a reviewing court that you interviewed someone when you participated in sitting there listening and [passing] notes as the detective, Sergeant Tompkins did on call number 2." The court did not address the draft revisions made by Sgt. Tompkins. It concluded by denying the motion.

On October 2, 2018, the circuit court also denied Thompson's challenge to the sufficiency of the search warrant. The following day, Thompson entered a conditional

guilty plea before Judge McGann to ten counts of the indictment and preserved his right to appeal the orders denying his motions to suppress. On March 8, 2019, Judge McGann sentenced Thompson to three consecutive life terms plus 145 years, consecutive to his federal sentence of 5,040 months imposed after his conviction on 18 counts of production of child pornography. Thompson then timely appealed the circuit court's denials of his motion for a *Franks* hearing and his challenge to the sufficiency of the search warrant.

## DISCUSSION

### I. Waiver of Motion for a *Franks* Hearing

Thompson asserts the circuit court erred in denying his motion for a *Franks* hearing. Thompson points out that although the court found his July 23, 2018 motion was not timely filed, it nonetheless considered and decided the merits of his request. In his initial brief, Thompson does not address waiver but reserved the right to respond in a reply brief. No reply brief was filed. We do note Thompson argued before the circuit court that there was "good cause" to excuse the late filing of the motion, in that the defense did not become aware until June 29, 2018 through the parallel federal case that Sgt. Tompkins was not present for Det. Avelar's first interview with the C.I.

The State maintains that Thompson's motion violated Maryland Rule 4-252, in that it was filed fourteen (14) months past the thirty (30) day deadline for filing a mandatory motion. The State also disputes Thompson's attempt below to show "good cause" for excusing the late filing. The State says the defense was provided with the "bulk of

discovery," including the challenged affidavit and Det. Avelar's notes on April 24, 2018, more than one year prior to Thompson's filing of the motion for the *Franks* hearing. The State adds that Thompson was not provided with the draft affidavits until *after* he filed his *Franks* hearing motion, so those documents could have played no role in his decision to file the motion. Finally, the State asserts that even if Thompson's failure to file a motion was excused up until June 29, 2018, his July 23, 2018 motion for a *Franks* hearing still would have been untimely, since Rule 4-252(b) requires that when discovery provides the basis for a motion, the motion must be filed within five days after discovery is furnished.

We agree with the State. Thompson's motion for a *Franks* hearing was not timely filed. Rule 4-252(a)-(b), Motions in Circuit Court, provides:

> (a) Mandatory Motions. In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:
> (1) A defect in the institution of the prosecution;
> (2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;
> (3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;
> (4) An unlawfully obtained admission, statement, or confession; and
> (5) A request for joint or separate trial of defendants or offenses.
> (b) Time for Filing Mandatory Motions. A motion under section (a) of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4-213(c), except when discovery discloses the basis for a motion, the motion may be filed within five days after the discovery is furnished.

*First*, Thompson has not disputed that his request for a *Franks* hearing is a mandatory motion. *Second*, Thompson filed the *Franks* request on July 23, 2018. That date is well beyond thirty days of counsel's entry of appearance or Thompson's first appearance in court. As the circuit court correctly noted in its ruling, Maryland courts have held "the provisions of Rule 4–252(b) require a motion to suppress to be filed within 30 days of the entry of the appearance of a defendant's first attorney. The later appearance of other counsel does not revive the 30–day period in which to file such a motion." *Allen v. State*, 91 Md. App. 775, 780 (1992). *Third*, his motion also did not fall within five days of June 29, 2018, the latest date Thompson pointed to as having acquired new information in discovery preceding his filing of the motion. *See* Rule 4-252(b). We conclude that Thompson did not meet these deadlines, and, thus, his request for a *Franks* hearing was not timely.

Despite reaching this conclusion, considering the importance of the substantive issues and because the circuit court decided the merits of the motion, we exercise our discretion consistent with Rule 8-131(a) and review the circuit court's ruling. Where, as here, the issues have been thoroughly briefed and argued, an analysis of the merits may guide trial courts and counsel in future *Franks* proceedings. See *Bradley v. Bradley*, 208 Md. App. 249, 257-58 (2012) (concluding an issue was preserved where it was decided by the trial court) (citing Md. Rule 8-131(a)).

## II.     Merits of Thompson's Motion for a *Franks* Hearing

**A.** *Background on* **Franks** *Hearings*

It is useful to begin with a discussion of *Franks* hearings generally. The procedure was born out of *Franks v. Delaware*, 438 U.S. 154 (1978), where police sought a search warrant for the home of the defendant, Franks, on suspicion of his involvement in a sexual assault. *Id.* at 157. In the search warrant affidavit, the affiant officer stated he had personal conversations with Franks' coworkers that confirmed his normal dress matched the victim's description of her assailant's clothing. *Id.* In their search of Franks' home pursuant to the warrant, officers seized Franks' clothing matching the victim's description. *Id.* Prior to trial Franks moved to suppress the evidence on the ground that the warrant affidavit was inaccurate and asserted his coworkers "would testify that neither had been personally interviewed by the warrant affiants, and that, although they might have talked to another police officer, any information given by them to that officer was 'somewhat different' from what was recited in the affidavit." *Id.* at 158. Franks further asserted the misstatements were included in the affidavit in "bad faith." *Id.* The trial court sustained the State's objection to Franks' ability to challenge anything but the facial sufficiency of the affidavit and denied his motion to suppress. *Id.* at 158–60. The court admitted the evidence and Franks was convicted. *Id.* at 160. The Supreme Court of Delaware affirmed.

The United States Supreme Court granted certiorari to address whether the trial court erred in refusing to consider Franks' attack on the veracity of the statements in the affidavit. *Id.* at 160–61. The Court reversed and remanded, holding a defendant should

have the ability to attack the veracity of an affiant's statements, given that the Warrant

Clause of the Fourth Amendment "takes the affiant's good faith as its premise." *Id.* at 164.

The Court explained the prerequisites for and nature of what would come to be known as

a *Franks* hearing:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.
>
> The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.
>
> Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

*Id.* at 171–72. The Court explained that *if* the defendant is granted the hearing, and

> the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 156.

-11-

This Court first recognized the requirements for a *Franks* hearing in *Yeagy v. State,* 63 Md. App. 1, 8 (1985). *Fitzgerald v. State*, 153 Md. App. 601, 644 (2003), *aff'd,* 384 Md. 484 (2004) ("To challenge an omission under *Franks* [] the accused must make a preliminary showing that it was made intentionally or with reckless disregard for accuracy; a negligent or innocent mistake does not suffice.") (quoting *Yeagy,* 63 Md. App. at 8). Our Court of Appeals aptly explained the procedure in *McDonald v. State*, 347 Md. 452 (1997):

> *Franks v. Delaware* set out a procedure, requiring a detailed proffer from the defense before the defendant is even entitled to a hearing to go behind the four corners of the warrant. Under *Franks*, when a defendant makes a substantial preliminary showing that the affiant intentionally or recklessly included false statements in the supporting affidavit for a search warrant, and that the affidavit is insufficient to support a finding of probable cause, the defendant is entitled to a hearing on the matter. The burden is on the defendant to establish knowing or reckless falsity by a preponderance of the evidence before the evidence is suppressed. Negligence or innocent mistake resulting in false statements in the affidavit is not sufficient to establish the defendant's burden.

*Id.* at 471.

This Court has also recognized the second prong of the pre-*Franks* hearing threshold: Even upon a substantial preliminary showing that the affiant intentionally or recklessly made false statements, the court must assess whether, if those statements were removed, the remainder of the affidavit would provide a substantial basis for finding probable cause. *State v. Jones*, 103 Md. App. 548, 601 (1995) *rev'd on other grounds*, 343 Md. 448 (1996). In *Jones* we explained:

-12-

When an otherwise viable claim is made that tainted information has contributed to a finding of probable cause in support of a warrant and that a *Franks* hearing should, therefore, be held, the court must engage in a hypothetical probable cause measurement. If the allegedly tainted information is factored out, will the remaining untainted information constitute probable cause or not? **If it will, the allegedly tainted information is mere surplusage and no *Franks* hearing is required.**

Sometimes an appellate court, on review, must deal with this hypothetical assessment. It is no different, however, than any other appellate assessment of probable cause. In the ordinary context, the appellate court is asked, "Does x equal probable cause?" In the hypothetical *Franks* context, the appellate court is asked, "Does x minus y still equal probable cause?" The difference between the two questions is only mathematical, not doctrinal.

*Id.* at 601, *rev'd on other grounds*, 343 Md. 448 (1996) (emphasis supplied).

In sum, there are two significant hurdles a defendant must clear before obtaining a *Franks* hearing. As Judge Moylan concluded in *Fitzgerald*, "a *Franks* hearing is a rare and extraordinary exception 1) that must be expressly requested and 2) that will not be indulged unless rigorous threshold requirements have been satisfied." 153 Md. App. at 642.

## B. *Defendant's Burden in a Motion for a* Franks *Hearing*

As a threshold matter, Thompson contends the circuit court applied the incorrect burden—a preponderance of evidence—in assessing his motion for a *Franks* hearing. Thompson focuses on the circuit court's alternating references to "substantial preliminary showing" and "preponderance of evidence" in its ruling:

**THE COURT**: And [in order for] the Court [] to grant a Franks hearing, the defense has to make a **substantial preliminary showing** of a false or reckless statement or omission. They must further show that the

-13-

alleged false statement or omission was necessary to a finding of probable cause.

    … [T]he case of *Fitzgerald v. State* holds that a *Franks* hearing is a rare and extraordinary exception. It will not be indulged unless rigorous special requirements have been satisfied. The burden is on the defendant to establish knowing or reckless falsity **by a preponderance of the evidence** before the evidence will be suppressed. It's only after the defendant makes this **preliminary showing** that he be entitled to a *Franks* hearing. **140, page 57**

    …I have to find that there's **a preliminary showing** of false or reckless statement or omission in this case by Sergeant Tompkins. I don't find that there was a false or reckless statement or omission.

    …

    [S]o I factor all of that in but I don't find there's been **a preliminary showing** and I'll therefore find that the **defense has not met its burden of preponderance of the evidence** to show false or reckless statement or omission. And that there was any statements or omissions or misstatements that there were necessary to a finding of the probable cause before Judge Rubin. I'll therefore deny the motion for a *Franks* hearing.

(emphasis added).

We concede it is not entirely clear whether the court believed Thompson had to make a substantial preliminary showing *or* to prove by a preponderance of evidence that Sgt. Tompkins included materially misleading statements in the affidavit. But given the court's substantive basis for its holding—**"I don't think it's improper or misleading or reckless to tell a reviewing court that you interviewed someone when you participated in sitting there listening and [passing] notes as the detective, Sergeant Tompkins did on call number 2"**—it appears that the court would have found neither burden satisfied, particularly since it accepted as fact that Sgt. Tompkins did not participate in the main

-14-

interview with the C.I.  Essentially, we conclude the court's varying burden references are not dispositive of the burden or analysis the court applied.

In any event, we note for the sake of clarity that Thompson is correct.  The burden on the defendant in requesting a *Franks* hearing is "a substantial preliminary showing," not a preponderance of evidence.  The latter is the burden to be applied *within* the *Franks* hearing itself, where a defendant is permitted to go beyond the four corners of the warrant and cross-examine the affiant to prove he or she made a materially misleading statement or omission.[3]

We now review Thompson's main contention: that the circuit court erred in finding he had not made the required showing that Sgt. Tompkins intentionally included false statements in the search warrant affidavit.

## C. *Thompson's Showing that Sgt. Tompkins Intentionally or Recklessly Included False Statements in the Affidavit*

We shall review the circuit court's assessment of the evidence presented of Sgt. Tompkins' intentional or reckless inclusion of misstatements in the affidavit for clear error.

---

[3] In case of any doubt on this point, we look directly to *Franks*, where the "preponderance of evidence" standard is not mentioned until discussion of the hearing itself.  438 U.S. at 156.  Further, the heavier burden of a preponderance of evidence would not be appropriate, or perhaps even practical, to apply until the defendant is able to obtain and provide evidence beyond the four corners of the warrant, such as testimony of the affiant—which is not obtained until the *Franks* hearing.  We also cannot say what higher standard would reasonably then be required in the *Franks* hearing if the defendant had already proven by a preponderance of evidence that the affiant had been intentionally misleading.

-15-

*See Braxton v. State*, 123 Md. App. 599, 645 (1998) (applying a clearly erroneous standard to review the circuit court's determination that a warrant affidavit was not tainted by police misrepresentation under *Franks v. Delaware*); *Wilson v. State*, 87 Md. App. 659, 668 (1991) (holding "the trial court was not clearly erroneous in finding that there was no basis for the suppression of the evidence.").

1. *Sgt. Tompkins' Statement that "the writer interviewed" the C.I.*

The main reason Thompson requested the *Franks* hearing was Sgt. Tompkins' statement in the affidavit, "the writer interviewed the anonymous source." He argues the difference between this statement and the original narrative written by Det. Avilar shows that Sgt. Tompkins knowingly misled the issuing judge into believing *she* personally interviewed the C.I. Thompson says this was a materially misleading statement, since "a reasonable magistrate may otherwise scrutinize whether second or third-hand information from a source has been reliably passed along." He asserts Sgt. Tompkins knowingly made this misstatement given its likely impact on the issuing judge's assessment, since she is "a reasonable police officer trained in the Fourth Amendment."

The State argues, assuming that the request for a *Franks* hearing was not waived, the court below properly ruled that Thompson failed to make the required preliminary showing. As for Thompson's contention with regard to "the writer interviewed" statement, the State maintains this was not a deliberate falsehood: Sgt. Tompkins had first-hand knowledge of everything the C.I. said in the interviews. The details of who was present

for an interview or who did the speaking have "no bearing on the veracity of the challenged statement . . . or the reliability of the information provided by the source." We agree with the State and explain.

To support his position, Thompson relies on a case from the Fifth Circuit, *Bennett v. City of Grand Prairie*, 883 F.2d 400, 407 (5th Cir. 1989), holding that "an affiant who merely relates the information of other officers 'invites increased judicial scrutiny[] of the affidavit.'" Thompson maintains that the reason for this added scrutiny is that critical details can be misconstrued or lost when information is passed between persons.

However, our Court rejected a defendant's nearly identical contention in *Hounshell v. State*, 61 Md. App. 364 (1985). There, the defendant argued before the trial court that the search warrant affidavit implied the affiant had personally interviewed all witnesses, when some of the witnesses had been interviewed by other officers. *Id.* at 379–80. The trial court denied the motion to suppress on grounds that "the fact that several witnesses were interviewed by police officers other than affiant . . . did not constitute a falsehood and did not affect the veracity of the affidavit in any way." *Id.* at 180. This Court agreed. *Id.*

We find *Hounshell*'s reasoning more persuasive than *Bennett*. Although we certainly agree information can be misconstrued when passed between persons, and that the affiant's 'distance' from the source in obtaining his information may affect its reliability, that concern is not manifest here. Thompson takes issue with the fact that Sgt. Tompkins was not present for the main interview with the C.I. We observe that the C.I.'s

interview was recorded. In editing the affidavit, Sgt. Tompkins need not have relied exclusively on the relay of information from Detectives Avelar or Sears to summarize and analyze what had been discussed; she could listen to the C.I.'s interview herself.

The circuit court also found that Sgt. Tompkins had been present for a subsequent unrecorded interview and participated by passing notes and questions to Det. Avelar, who was speaking directly with the C.I. Although Thompson appears skeptical of this version of events because, in his opinion, the State's account had varied and MCPD failed to memorialize Sgt. Tompkins' participation in the interviews, the motions court listened to the arguments of counsel and was free to examine Sgt. Tompkins' revisions side-by-side with Det. Avelar's original narrative and determine whether those revisions amounted to a substantial showing that she intentionally, or with reckless disregard, misled Judge Rubin in light of the totality of the circumstances.

We note that at oral argument Thompson's counsel suggested that perhaps a better procedure would have been for the motions court to have called Sgt. Thompkins and Det. Avelar as witnesses to assess their credibility first-hand. We leave it to the sound discretion of the trial court how it determines whether a defendant has made the requisite substantial showing for a *Franks* hearing. We can easily envision a recommendation from this Court to call witnesses in such circumstances the equivalent of a *Franks* hearing in all but name, rather than a preliminary assessment of whether such a hearing is warranted. We leave that assessment to the sound discretion of the trial courts.

-18-

2. *Sgt. Tompkins' attributions to the C.I.*

Thompson asserts he also made an adequate showing that Sgt. Tompkins falsely attributed statements to the C.I. in order to help bolster the C.I.'s credibility. He focuses on Sgt. Tompkins' statement that through a Baltimore County Police report she was able to corroborate the C.I.'s claims that Thompson abused Victim A "a few years ago" at Ballinger Terrace. The police report, Thompson points out, did not contain the name "Kyle" (or "Kyle Thompson"), nor did it "establish[] a nexus to Ballinger Terrace." Finally, Thompson claims the police report "has no corroborative value" since Sgt. Tompkins deliberately misattributed the corresponding statements to the C.I.

The State contends Thompson provides no proof to substantiate these claims and ignores evidence that refutes them. The State maintains the C.I. did "disclose the precise address where Thompson lived, that Victim A was abused by Thompson in the woods while at his house, and that her mother knew that it was occurring and lied to investigators regarding her lack of knowledge about Thompson," as evidenced by the recorded call transcript. The State also says that although Thompson's name and address were not included in the Baltimore County Police report, they were in the CPS Report Disposition which is alluded to elsewhere in the affidavit. The State says any misattribution of information to one report instead of the other was only negligence, since it would not have benefitted Sgt. Tompkins to cite the wrong report.

For the reasons that follow, we find no clear error in the circuit court's ruling that Thompson failed to meet his burden, even in light of Sgt. Tompkins' attribution of the challenged statements to the C.I.

Our research yields only a few cases where Maryland courts have reviewed the denial of a *Franks* hearing, and even fewer that are capable of analogy here. *First*, we note *Emory v. State*, 101 Md. App. 585 (1994), where this Court affirmed the circuit court's denial of a *Franks* hearing, finding the defendant failed to make a substantial preliminary showing that the affiant acted with reckless disregard for the truth. *Id.* at 632. In alleging the State's recklessness, the defendant pointed to discrepancies between the affidavit and the evidence turned over in discovery—not to claim the statements in question were false, but rather that the State had not provided evidence to support them. *Id.* at 632–33. This Court held this was not an "adequate demonstration of any deliberate disregard for truth on the part of" the affiant, since the defendant did not make any showing of what *was* turned over in discovery, and even admitted to not reviewing everything provided by the State. *Id.* at 633.

More recently we affirmed a circuit court's denial of a *Franks* hearing in *Young v. State*, 234 Md. App. 720 (2017). There, the defendant disputed the affiant's claim that he observed the defendant selling drugs to a confidential informant. *Id.* at 739. Although we found dispositive that the *Franks* issue was apparently resolved in chambers, we noted the defendant had not met his burden since "he never even claim[ed] intentional or reckless

-20-

falsehood, which is the entire basis for a *Franks* motion." *Id.* We also pointed out the defendant made only bare allegations that the evidence was stale and that the affiant was lying. *Id.* We take from *Young* the importance of a proffer of evidence that will demonstrate the falsity of the affiant's statement as well as the affiant's scienter in making the misstatement.

Here, the record before the circuit court was extensive, and most of the discussion at the hearing centered around the "writer interviewed" statement. However, the parties and the court discussed three critical evidentiary points related to Sgt. Tompkins' affidavit revisions attributing more information to the C.I.:

1. Thompson pointed out that Sgt. Tompkins had testified that on the evening of March 16th, she did not think MCPD had probable cause. She directed Det. Avelar to draft the affidavit, and she made revisions the following day to attribute some information to the C.I. that was previously attributed to the police report. When making these revisions, Sgt. Tompkins did not obtain any new information since the previous night when Det. Avelar had written the first draft. Thompson argued the sequence of these events amounted to a substantial showing of Sgt. Tompkins' motive to mislead the issuing judge.

2. The State pointed out that it was after the first two phone calls with the C.I. that MCPD obtained the CPS Report (based on its 8:30PM time stamp). The State said Sgt. Tompkins clarified with the C.I. the details from the CPS and police reports in the latter two phone calls, asserting the C.I. had in fact provided all of the information Sgt. Tompkins attributed to her.

3. The State directed the Court to page five of the transcript of the recorded phone call with the C.I. (the main, thirty-two-minute interview), to refute Thompson's claim that the C.I. did not inform MCPD that Victim A's mother had lied to police about not knowing Thompson assaulted her daughter. In that part of the transcript the C.I. says:

-21-

Kyle and [Child 1 & Victim A's mom] ("mother") have known each other. And he would go and pick [mother] up . . . and the one time she brought the little girl [Victim A] and this was before [mother] had his children. And, um, he, [mother] allowed him to take [Victim A] down in the woods and feel her, touch her, do whatever, and then [Victim A] came screaming up and [mother] said oh it's ok, he didn't mean to do anything. But she, the mother, was aware of what was happening.

The circuit court did not address in its ruling this part of the argument. It did state it had read what had been filed and considered the case law, and thus had "a pretty good clarification." The court said the parties seemed to agree that the "affidavit was based on what Sgt. Tompkins had explained and she explained the information [was] coming from an anonymous source."

Thompson's claim is similar to the defendant's claim in *Emory*. Thompson does not point to evidence in the record that expressly refutes the claim that the C.I. told MCPD that Thompson sexually assaulted Victim A years ago at Ballinger Terrace and that the mother lied to law enforcement in claiming she was unaware of the abuse. Instead, he points to the absence of evidence that the C.I. said *any* of this. Thompson reasons, essentially, that Det. Avelar—who was present for the main interview with the C.I—attributed fewer factual statements to the C.I., and since Sgt. Tompkins did not maintain any notes of conversations with the C.I., there is nothing to rebut the inference that Sgt. Tompkins was dishonest and deliberate in attributing such statements to the C.I.

This reasoning wholly ignores the other phone calls MCPD had with the C.I. that evening. The State alleges the C.I. made the disputed statements in the subsequent phone

-22-

interviews—phone calls the State says MCPD made for the very purpose of corroboration after detectives reviewed the 2015 CPS and police reports. Thompson discounts this argument because there is no documentation of the content of the calls. While we cannot help but agree that the lack of documentation in this situation is frustrating and even concerning, it does not preclude the possibility that Sgt. Tompkins was revising the affidavit to reflect that the C.I. had provided additional information in a later phone call, and Sgt. Tompkins was emphasizing the corroboration that had occurred in a way Det. Avelar had not. We suspect when writing affidavits, officers highlight their strongest evidence. Of course, we do not purport to know whether Sgt. Tompkins' statements were accurate. The key facts were materially true and available to the judge in the record before him, particularly the call transcript excerpt the State provided at the hearing.

Thompson argues "the source does not state that Thompson told her he made [Victim A's] mother lie" in the recorded interview.[4] While we agree with Thompson that the call transcript does not corroborate everything said in the affidavit about Victim A (for example, it does not mention any law enforcement involvement related to the alleged abuse of Victim A), he ignores the corroborative value the transcript has in confirming the C.I. knew of the abuse, that Victim A's mother was aware of it, and even that Victim A's mother

_____

[4] Thompson misstates the claim from the affidavit. It says, "Anonymous source related that [Victim A's] mother lied to the Police and Child Protective Services, relating that she did not know the suspect's full name and whereabouts."

-23-

did not know Thompson's full name.[5]  The lack of evidence for every fact presented in the affidavit in the call transcript does not necessarily render those facts untrue.

To satisfy the required preliminary showing, we determine Thompson would have needed to do more than point to the absence of evidence for certain claims in the affidavit. He needed to proffer evidence that contradicted those statements. On the facts before the circuit court, and the lack of evidence directly refuting the challenged statements in the affidavit or showing Sgt. Tompkins' intent to mislead, we hold there was no clear error in the circuit court's conclusion that Thompson failed to meet his burden.

We do not end our analysis here though.  We understand that the lack of documentation of subsequent phone calls with the C.I. may have worked to the State's advantage.  To resolve any doubt, we will evaluate the affidavit as if Thompson has made a substantial preliminary showing that Sgt. Tompkins' attributions to the C.I. were added with the intention to materially mislead the issuing judge. Therefore, for the next part of our analysis, we will remove the attributions to the C.I. challenged by Thompson to determine if the remainder of the affidavit provides a substantial basis upon which to find probable cause.  If we find in the affirmative, we can confidently conclude a *Franks* hearing would not have been warranted in any event.

**D.** *Basis for Finding Probable Cause in the Warrant Without Allegedly Misleading Statements*

---

[5] On the next page of the call transcript, the C.I. quoted Thompson describing Victim A's mother, saying, "she's stupid, she's that dumb, she doesn't even know my last name."

In assessing the second part of the *Franks* hearing threshold, we will determine whether absent the challenged attributions in the warrant, there would have been a substantial basis for finding probable cause. *Jones*, 103 Md. App. at 601. Because Thompson's second challenge on appeal is to the affidavit's probable cause even *without* the contested statements removed, we incorporate and address those arguments in the context of this hypothetically excised affidavit.

We begin by laying out the relevant parts of the affidavit's investigative summary with the potentially misleading statements removed [6]:

> On March 16, 2017, The Special Victims Investigation Division was made aware of and began an investigation regarding a sexual assault of a minor. In this report it is alleged Kyle S. Thompson, a 31-year-old male, with a date of birth [] sexually assaulted [Child 1] a 4 year old female, with a date of birth [] identified as his daughter. The sexual assaults occurred at 14215 Ballinger Terrace, Burtonsville, Montgomery County, Maryland 20866. The reporting source would like to remain anonymous due to fear of retribution and will hereafter be referred to as the anonymous source.
>
> On March 16, 2017, the writer interviewed the anonymous source. The anonymous source stated Kyle S. Thompson showed the anonymous source several videos of Thompson [sexually assaulting] his 4-year-old daughter, [Child 1] and two other unidentified prepubescent females.
>
> [Description of the video content]
>
> The source further stated that Thompson had previously sexually abused [Child 1's] older sister [Victim A] a few years prior. [Victim A] was approximately 9 years old when he sexually abused her. The writer conducted a check with Child Protective Services and other police agencies and could corroborate the information given by the source regarding [Victim

---

[6] We effectively revert the challenged sentences back to their original form in Det. Avelar's draft of the affidavit.

A].  The writer found a sexual abuse report from Baltimore County Police dated October 9, 2015.  The report stated [Victim A] was sexually abused by her mother's boyfriend "Kyle."  [Victim A's] mother lied to the Police and Child Protective Services of not knowing his full name and where about.  [Victim A] disclosed the abuse happened when her and her mother went to "Kyle's house" located at 14215 Ballinger Terrace, Burtonsville, MD.

Thompson stated the abused happen [sic] in a wooded area near his [missing word] in Montgomery County, Maryland.  Thompson has a history of being a violent man.  A check with MSP revealed he owns about 15 firearms.

The warrant then provides three paragraphs' discussion of how persons who view

child pornography store evidence of the behavior. For example:

Through Training and experience, subjects who view or collect child pornography value their collections and often go to great lengths to organize and protect their collections including concealing the images on computer media.  Your Affiant also knows through training, knowledge and experience that when subjects possessing child pornography conceal or delete it to avoid detection that it is possible to recover files and data from computer media in hidden areas or after it has been deleted.  They do not limit themselves with electronic images/videos and at times have physical copies of some of their images.

. . .

Your Affiant also knows through training and experience that images of child pornography can be retained via physical items such as but not limited to; scanned copies, photographs (to include "Polaroid" images), magazines, magazine cutouts, and other similar physical items.

The affidavit continues:

During the initial investigation, the affiant learned Thompson has access to at least 15 firearms which could pose a threat to serving police officers.  Furthermore, during the investigation, it appears Thompson has previously threatened individuals that make allegations against him, which was related to your affiant by the anonymous source.

-26-

The affidavit concludes by requesting a search warrant for 14215 Ballinger Terrace, "for evidence pertaining to, but not limited to Sexual Abuse of a Minor [], First Degree Sex Offense [], Child Porn Promote/Distribute [] and Possession of Child Pornography []."

Thompson asserts there was not a substantial basis for finding probable cause, because: (1) the sole basis for Sgt. Tompkins' conclusion that evidence of child sexual abuse and child pornography were located at Ballinger Terrace was the information provided by the C.I., (2) the C.I. had no history of providing reliable information to police, and (3) in the absence of that history, the affidavit lacked sufficient details about the nexus to Ballinger Terrace or details to otherwise establish the credibility of the C.I. Thompson maintains the affidavit failed to establish a nexus to his Ballinger Terrace address because it did not say where the anonymous source had viewed the videos, whether the source had ever been to Ballinger Terrace, and whether Thompson's identity or his past or current residence at Ballinger Terrace had been confirmed.

The State counters that even if Thompson could show that Sgt. Tompkins knowingly or recklessly added false information to the affidavit, such information was not necessary for finding probable cause. The State asserts that even with the challenged statements removed from the affidavit, probable cause could be found in the remaining contents, particularly because: (1) the affidavit would still imply someone in the police department had direct contact with the C.I., (2) the C.I.'s detailed knowledge of the sexual assault of Victim A, corroborated by a police report and a CPS report would be sufficient to establish

the veracity of the C.I.'s claims, and (3) the affidavit would still contain the statement that Thompson told the C.I. the abuse of Victim A "happened in a wooded area near his house in Montgomery County, Maryland," which would permit a reasonable inference that "his house" referred to his Ballinger Terrace address. The State also says the affidavit's statements that "sexual assaults occurred at [Ballinger Terrace]" and that "[a] check with Maryland State Police Automated Firearms Services System revealed Thompson owns 15 firearms" would imply Sgt. Tompkins confirmed the address of Thompson's residence.

We agree with the State. For the reasons that follow, we conclude that in the absence of the challenged attributions to the C.I., the remaining contents of the affidavit provide a substantial basis upon which probable cause could be found.

### 1. *Standard of Review*

As we noted from *Jones*, *supra*, our review related to probable cause after removing the potentially misleading statements from the affidavit is no different than our review of a probable cause determination under ordinary circumstances. *Jones*, 103 Md. App. at 601. A reviewing court determines not whether there *was* probable cause (that is, whether the court itself would find probable cause), but "whether *the issuing judge had a substantial basis* for concluding the warrant was supported by probable cause." *Patterson v. State*, 401 Md. 76, 89 (2007) (emphasis added). We consider the task that was before the issuing judge: "to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or

evidence of a crime will be found in a particular search." *Id.* at 89 (quoting *Greenstreet v. State*, 392 Md. 652, 667–68 (2006)). The standard is flexible in order to encourage police use of warrants. *State v. Jenkins*, 178 Md. App. 156, 164–65 (2008).

Accordingly, appellate review of the issuing judge's decision is not *de novo*, but "rather a deferential one." *Patterson*, 401 Md. at 89 (quoting *Greenstreet*, 392 Md. at 667). "As a practical matter, that means that, at the very least, we will accept [the issuing judge's] implicit fact-finding, unless clearly erroneous, and, beyond that, we will view the factual recitations in the warrant application in the light most favorable to the State." *Ellis v. State*, 185 Md. App. 522, 534–35 (2009) (internal citations and quotations omitted). Our review of the issuing judge's determination is confined "solely to the information provided in the warrant and its accompanying application documents." *Patterson*, 401 Md. at 90. The "substantial basis" for which we are looking demands more than a bare bones conclusory statement that the affiant has cause to suspect something, but less than even the "'clearly erroneous' standard by which appellate courts review judicial fact-finding in a trial setting." *West v. State*, 137 Md. App. 314, 323, 325 (2001). "Doubtful or marginal cases should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

### 2. *Defining Probable Cause*

The seminal case, *Illinois v. Gates*, 462 U.S. 213 (1983), instructs that probable cause is a "practical, nontechnical conception." *Id.* at 231. *Gates* abandoned the previously

used strict two-prong test that required definitively establishing (1) the basis of the informant's knowledge, and (2) the veracity of the tip (demonstrated by the credibility of the informant or the reliability of his information). *West*, 137 Md. App. at 328 (citing *Aguilar v. Texas*, 378 U.S. 108, 114 (1964)). Through its adoption of a flexible "totality-of-the-circumstances" approach, *Gates* permitted the balancing of the two factors, so that a strong showing of one can compensate for a lesser showing of the other. *Gates*, 462 U.S. at 233. This Court recognized in *Trussel v. State*, 67 Md. App. 23 (1986), however, that use of the two factors was "not dead" after *Gates*; rather, the factors "have simply been reduced from 'constitutionally binding' stature to 'helpful guidelines' stature." *Id.* at 29. With this principle in mind, we will consider these factors in our assessment. But it is clear to us that neither are required in a fixed amount. Rather, a lesser showing of one factor can be compensated by a stronger showing of the other, or another indicia of veracity.

### 3. *C.I.'s Basis of Knowledge*

Regarding the C.I.'s basis of knowledge, Thompson points out the affidavit did not contain any information on the relationship between the C.I. and himself. While it is true the nature of the relationship is not specified—e.g., whether the two are friends, relatives, neighbors, etc.—the affidavit demonstrates that the C.I.'s basis of knowledge is first-hand: "The anonymous source stated [Thompson] showed the anonymous source several videos." Further, the affidavit's explanation that the C.I. feared retribution could also indicate her relationship with Thompson is personal. This is a stronger showing of basis

-30-

of knowledge than cases where courts have found an insufficient showing of the factor.

For instance, in *Gates*, police received an anonymous letter containing nothing but conclusory statements, such as "you have a couple in your town who strictly make their living on selling drugs"; "Presently they have over $10,000 worth of drugs in their basement"; "I guarantee if you watch them carefully you will make a big catch." 462 U.S. at 225. The Supreme Court affirmed the letter was insufficient on its own to establish probable cause, since it provided "absolutely no indication of the basis for the writer's predictions regarding the [suspects'] criminal activities." 462 U.S. at 227.

This Court reached a similar outcome in *West*. There, the affidavit stated the affiant "received numerous complaints from several different concerned citizens about the narcotic activity going on inside of 4416 Marble Hall Road apt #340 by an individual known as Tyrone Antonio West." 137 Md. App. at 319. Nothing more specific was said in regard to how the citizens obtained their information. *Id.* This Court concluded:

> [M]entioned nowhere within the affidavit is the basis of the concerned citizens' knowledge regarding their complaints. The affidavit makes no mention of whether these people are speaking from first-hand knowledge received through their own senses or are merely passing on information they heard from others. . . [A] magistrate, when issuing a warrant, must be presented with a more substantial reason for relying on information than the mere possibility that information is based on a "casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation."

*Id.* at 331-32 (quoting *Spinelli v. U.S.*, 393 U.S. 410, 416 (1969)). *West* and *Gates* are distinguishable from Thompson's case. The affidavit here makes clear the source learned

-31-

of the videos 'through her own senses' and through direct contact with Thompson, rather than through rumors. While this aspect on its own does not provide a substantial basis for probable cause, the greater showing of a basis of knowledge here than in *West* and *Gates* could reasonably require a lesser degree of corroboration for probable cause. *See Jenkins*, 178 Md. App. at 184 ("How much verification is needed depends upon how much bolstering the 'credibility' requires."). We find the C.I.'s basis of knowledge contributes to the totality of circumstances from which the issuing judge could find probable cause.

### 4. *Veracity: Credibility of C.I. or Corroboration of Information from C.I.*

The most frequent grounds on which courts have found a source to be credible is when that source has a history of providing reliable information to police. *Jenkins*, 178 Md. App. at 183. It is uncontested that the C.I. in this case had no such history.

Our courts have attributed credibility to a law enforcement source who has not concealed their identity, as the person is then available for follow-up questions and can be criminally charged if the information proves false. *Jenkins*, 178 Md. App. at 185 ("A minor factor, but one nonetheless worth noting, was that the CI was not an anonymous tipster. The CI had been arrested by the Special Operations Division within the preceding three weeks and was known to them…. It does . . .move the CI a little bit up the credibility scale, compared to an anonymous telephone tipster or letter writer."); *Cross v. State*, 165 Md. App. 164, 187 (2005) (explaining where the informant had confronted law enforcement himself and had not hidden his identity, he "put himself in a position where he could be

-32-

held accountable if his information proved false," and so "the likelihood that the information was reliable was much greater than if the information had been obtained from a truly anonymous tipster.")

In reviewing the affidavit here, we note it gives no indication that the "anonymous source" was someone who provided her identity and contact information to police and could be (and was) contacted for follow-up questions. We are mindful of our decision in *West* where we explained that stating police "interviewed" an anonymous source, without other details, could imply the source made an anonymous phone call to police, maintaining her hidden identity. 137 Md. App. at 330–31. The closest the affidavit comes to indicating that police may know the C.I.'s identity is the statement, "The reporting source would like to remain anonymous due to fear of retributions and will hereafter be referred to as the anonymous source." But with nothing more, this statement does not provide a substantial basis for inferring the police knew the source's identity. It is likely insufficient to move the C.I. "up the credibility scale" in the way the C.I.s in *Jenkins* and *Cross* were.

With some showing of the C.I.'s basis of knowledge in this instance, but little to no indication of her credibility within the four corners of the affidavit, either corroboration of other information from the C.I. or some other indicia of reliability is needed. Appellate opinions reveal that the degree of corroboration required is not universally quantifiable. As we have said, the degree of information to be corroborated depends on the strength of the showing of other factors, such as the source's past reliability and their basis of

knowledge. *Jenkins*, 178 Md. App. at 184. Also, corroboration of some facts obviates the need to corroborate *all* others. *Id.* (quoting *Hignut v. State*, 17 Md. App. 399, 411 (1973) ("A direct showing that some of the story has been verified as true lends credence to the remaining unverified portions of the story)).

Finally, corroboration of certain types of facts carry more weight in establishing the source's credibility, perhaps obviating the need to complete additional corroboration. For instance, in *Gates*, the absence of the anonymous source's basis of knowledge (or past reliability) meant that some corroboration was required before probable cause could be found. 462 U.S. at 227. Ultimately, through corroboration of several facts—the suspects' anticipated flight and motel reservations and a road trip route—the Court found police had made up for the lack of the source's basis of knowledge, therefore establishing probable cause. *Id.* at 243–46. Notably, *Gates* did not require corroboration of criminal acts; corroboration of innocent details (that may be indicative of criminal activity when taken together) could suffice. 462 U.S. at 242–43. But the Court accorded significant weight to the corroboration of details from the anonymous source "relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 245.

Applying the analysis in *Gates* to the facts here, we determine that any substantial basis for finding probable cause from the affidavit here hinged on MCPD's corroboration of facts the C.I. alleged. Although the affidavit does not mention any statements by the

C.I. about Thompson's future acts, it states that MCPD corroborated the information the C.I. provided about Thompson's alleged sexual assault of a young girl years prior. And beyond MCPD's general statement, certain details reported from the C.I. are indicative of intimate knowledge of the assault. For instance, the affidavit's statement that the C.I. said the victim was the older sister of his daughter, combined with the affidavit's explanation that the police report said the child was sexually abused "by her mother's boyfriend 'Kyle,'" shows consistency between the source's information and the police report—but is also not so obvious as to be easily fabricated. The same can be said of the statement that Thompson said the assault occurred in the woods. These details were not publicly available, and thus would not have been easily obtained by a person who did not have a close connection to Thompson. We do not purport to say this corroboration is independently sufficient to establish probable cause. That question is not before us. What we can say is that this corroboration provides a substantial basis upon which the issuing judge could find the C.I. credible.

   5.  *Nexus to the Place to be Searched*

We have found that the excised affidavit provided a substantial basis upon which the issuing judge could have found the source credible. We next determine whether the affidavit connected Thompson and the alleged sexual assaults to his Ballinger Terrace home. *Braxton*, 123 Md. App. at 630.

We first look to *Holmes v. State*, 368 Md. 506 (2002), which the State referenced in its brief and acknowledged by this Court as the "authoritative Court of Appeals case on nexus." *Joppy v. State*, 232 Md. App. 510, 523 (2017). In *Holmes*, the petitioner claimed the warrant affidavit failed to establish a substantial nexus between the petitioner's activities outside the house for which the warrant was obtained and the house itself. 368 Md. at 512. The affidavit stated the affiant observed the petitioner engage in a hand-to-hand exchange that the affiant, based on his experience, concluded was a drug sale. After he stopped the petitioner, the petitioner was in possession of a large quantity of marijuana and money. *Id.* at 519. The affiant also stated that he saw the petitioner enter and exit the residence immediately before the hand-to-hand exchange. *Id.* Drawing on two of its own past cases, as well as numerous cases from the federal courts of appeals, our Court of Appeals laid out the principle that

> Direct evidence that contraband exists in the home is not required for a search warrant; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items.
> . . .
> [But] the mere observation, documentation, or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home. There must be something more that, directly or by reasonable inference, will allow a neutral magistrate to determine that the contraband may be found in the home."

*Id.* at 522—23. The Court concluded that the sum of the evidence provided in the affidavit was sufficient to connect his drug transaction to the home. *Id.* at 523–24.

-36-

As Judge Moylan explained in *Joppy v. State*, 232 Md. App. 510 (2017), the facts in *Holmes* provided a rather "easy" basis for finding nexus to be established—but *Holmes* does not stand for the proposition that any affidavit with a "less overwhelming proffer[]" will fail. *Id.* at 523. "The bar, fortunately, is not set that high." *Id.* at 524.

In *Moats v. State*, 455 Md. 682 (2017), the search warrant affidavit was devoid of specific facts linking the crime to the place to be searched. Nevertheless, the Court of Appeals held that the affidavit provided a substantial basis for probable cause to search the defendant's cell phone for evidence of a suspected drug distribution and a sexual assault. Although the affidavit contained details of numerous witnesses' statements regarding the defendant's drug use and his commission of the sexual assault, there were no statements specifically linking the suspected crimes to the defendant's phone. *Id.* at 700. The affiant's only basis for concluding the phone might contain such evidence was the affiant's purported expertise and knowledge that "individuals who participate in such crimes communicate via cellular telephones, via text messages, calls, e-mails, etc." *Id.* at 702. The Court was satisfied that this statement provided a substantial basis for probable cause to search the phone, explaining that it "has never been required by the Fourth Amendment" that an affidavit contain specific facts linking the crimes to the place to be searched. *Id.* at 700. Applying the rule from *Holmes*, the Court found the affiant's inference that the defendant would have evidence of the sexual assault on his phone was not unreasonable, given the prevalence of cell phones and their use as storage devices, even for sensitive

"personal effects." *Id.* at 700–03. The Court also noted that because drug distribution is a crime requiring at least two persons, use of a cell phone in its commission would be a "common-sense conclusion." *Id.* (quoting *Gates*, 462 U.S. at 231).

We compare *Moats'* and *Holmes'* holdings to the facts here. In the affidavit, Sgt. Tompkins' states that based on her experience, evidence of child sexual assaults would likely be kept at the perpetrators' residences:

> Through training and experience, subjects who view or collect child pornography value their collections and often go to great lengths to organize and protect their collections including concealing the images on computer media. Your Affiant also knows through training, knowledge and experience that when subjects possessing child pornography conceal or delete it to avoid detection that it is possible to recover files and data from computer media in hidden areas or after it has been deleted. They do not limit themselves with electronic images/videos and at times have physical copies of some of their images.
> …
> Collectors [of child pornography] will often write down passwords to protected stored items on ledgers, paper, notepads, etc. … This digital "collection" of images is also evidence of the actual sexual abuse of a child, and perpetrators creating this material for possession or distribution will frequently keep indicia of their sexual interest in the child in the residence, plus the necessary tools for creation, such as props, and clothing.

We conclude that it was not unreasonable to infer that child sex pornographers might keep evidence of their crimes hidden in their homes. It was reasonable for Judge Rubin, the issuing judge, to accept these inferences that evidence of Thompson's assaults would be kept at his home.

In terms of Thompson's challenge to the affidavit's failure to say when or how his address was confirmed, we note that a similar claim was before this Court in *Braxton v.*

*State*.  There, the appellant did *not* challenge the affidavit for failing to state that he lived at the given address, or even for failing to provide a basis for why the affiant thought the appellant would keep such evidence at his home; the affidavit did both of those things.  123 Md. App. at 629.   Rather, Braxton's challenge was on the basis the affidavit "contained absolutely no clue as to *why* the police believed appellant lived at the particular location identified."  *Id.* (emphasis in original).  This Court agreed with Braxton:

> Accordingly, we hold that the mere identification in the affidavit of appellant's address, without even a single predicate fact showing the basis for the belief the appellant resided at that address, did not establish probable cause to search that location.  This is so even if there was otherwise every reason to believe that appellant committed the armed robbery and harbored the fruits and instrumentalities wherever he may have lived.
> …
> Typically, an affidavit includes an averment tying the suspect to the targeted location on the basis of surveillance, a check of utility records, verification with a landlord, an address from the phone book, or the like.

*Id.* at 630.

The affidavit here is distinguishable from the one challenged in *Braxton*.  Although it did not mention any "typical" check such as a review of utility records or address from a phone book, the affidavit contains other facts that could form the basis of the affiant's belief that Thompson lived at 14215 Ballinger Terrace.  *First*, we examine the following sentences:

> In this report it is alleged Kyle S. Thompson . . . sexually assaulted [Child 1].  The sexual assaults occurred at 14215 Ballinger Terrace.  The reporting source would like to remain anonymous due to fear of retributions.

-39-

These statements, taken together, infer it was the reporting source who said the assaults took place at Ballinger Terrace, rather than being a conclusory statement by the affiant. *Second*, perhaps even more persuasive, is in the affiant's summary of the Baltimore County Police report: "[Victim A] disclosed the abuse happened when her and her mother went to 'Kyle's house' located at 14215 Ballinger Terrace, Burtonsville, MD." Although it is unclear from that statement who provided or confirmed Ballinger Terrace was the location of the assault, the statement clearly implies such information came from the police report. *Third*, the statement, "Thompson stated the abused happen [sic] in a wooded area near his [missing word] in Montgomery County, Maryland," could also form the basis of the affiant's belief that Ballinger Terrace was Thompson's home and the site of past sexual assaults. Finally, the affiant obtained Thompson's firearm ownership history through a search of Maryland State Police ("MSP") records. It would be reasonable to infer that those records revealed that Thompson's address was 14215 Ballinger Terrace.

We find that the inference provided by the affiant about the likelihood of finding evidence of a child sexual assault or pornography at the offender's home, the statements of past assaults occurring at Ballinger Terrace attributed to the police report and the C.I., and the statement that MSP records for Thompson were checked, establish a nexus between Thompson, his past sexual assaults, and his Ballinger Terrace home.

Under the totality of the circumstances, we hold the affidavit—even with the challenged statements excised—provided a substantial basis upon which the issuing judge could have found probable cause. Accordingly, no *Franks* hearing was warranted.

As discussed, this determination obviates any need to address Thompson's second issue on the denial of his subsequent challenge to the sufficiency of the warrant, as well as the good faith analysis. It similarly precludes the need for us to determine whether the circuit court improperly deferred to the parallel federal case in reaching its holding on the motion for a *Franks* hearing. Therefore, we conclude that the circuit court did not commit reversible error in denying Thompson's motion for a *Franks* hearing, or in denying his challenge to the sufficiency of the search warrant.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY AFFIRMED. APPELLANT TO PAY COSTS.**